## SUSAN A. PARKER v. AETNA LIFE INSURANCE COMPANY, Appellant.

### Division One, July 11, 1921.

1. **LIFE INSURANCE: Suicide: Laws of California: Valid Provision.** Where the substantive rights of the parties are governed by the laws of California, where the parties resided, the life insurance policy was made and delivered and the insured died, a provision in the policy that it should be void in case the insured committed suicide is valid, in a suit brought on the policy of the beneficiary in the courts of Missouri, there being no statute of California prohibiting or making void such a provision.

2. ———: ———: **Burden of Proof.** Where an ordinary life insurance policy contains a valid provision that if the insured shall within one year commit suicide, sane or insane, then such policy

Parker v. Aetna Life Ins. Co.

shall be null and void, the burden of proof that the insured did commit suicide is upon the insurance company, for suicide is an affirmative defense that must be both pleaded and proved; and though the policy contains the provision that suicide, "sane or insane," shall avoid the policy, the burden still rests upon the company to show that the insured designedly, and not accidentally, killed himself, for suicide is the act of designedly destroying one's own life.

3. ———: ———: Peremptory Instruction: Circumstantial Evidence. Where the evidence as to the manner of the insured's death is wholly circumstantial, suicide cannot be declared by the court, as a matter of law, unless the circumstances exclude every reasonable hypothesis except suicide.

4. ———: ———: Plaintiff's Admissions: Wholly Circumstantial. The answer to the contention that the evidence of the manner in which the insured took his own life is not all circumstantial, because the plaintiff herself admitted that the insured committed suicide, is her denial that she ever made such admission. Besides, her admissions to that effect in the proof of death made to other companies, and in statements by her on other occasions, if made, are but conclusions drawn from the circumstances surrounding the insured's death, and are not absolutely binding upon the jury, but it is the duty of the jury to arrive at the ultimate fact as to whether or not the insured did commit suicide, from all the facts and circumstances, including the admissions, if any, made by her; and the weight to be attached to her admissions, in view of her hysterical condition, at the time she witnessed the tragedy and when she is said to have made such admissions, is likewise a question for the jury.

5. ———: ———: Drunken Man. Where the discharge of the automatic pistol may as well have happened from the careless conduct of a drunken man as from an intentional act, and a door shut off from view the exact manner in which the pistol was discharged and prevented definite knowledge, and everything in his business and conduct prior to the time he became intoxicated indicated a purpose to press forward with energy, it cannot be ruled that all reasonable men would agree that the undisputed facts and circumstances exclude every reasonable hypothesis except suicide.

6. ———: ———: Presumption. Where the facts and circumstances are made to appear in evidence, the presumption against suicide, as a presumption of law, disappears, but as a presumption of fact it is and must ever be present with all reasonable men whose duty it is to pass upon the ultimate fact of suicide or accident, where the evidence is all circumstantial.

7. ———: ———: **Instruction: Obscured by Matters Unnecessary to Prove.** An instruction for plaintiff telling the jury that plaintiff is entitled to recover unless they further find that the insured committed suicide, and others for defendant requiring a verdict for defendant if they find he did commit suicide, are not contradictory, should be read together, and clearly present the issue of suicide; and that issue, being the only contested one throughout a long trial, is not submerged or in any wise obscured by the fact that plaintiff's instruction includes matters which plaintiff was not absolutely required to prove, such as whether all premiums re- quired to keep the policy in force had been paid, and that defend- ant failed to furnish blanks for proof of death and denied liability.

8. **EVIDENCE: What Witness Thought: Corrected.** It is not im- proper to strike out the answers of a witness beginning with, "I understand," "I thought," "I think," etc.; but if there is any error in striking them out, appellant cannot complain when the same answers were brought before the jury, in their full com- prehensiveness, by respondent's evidence on cross-examination.

9. ———: **Powder Burn; Distance of Pistol from Wound: Non-Expert Matter.** The witness, after stating that the wound in the deceased's forehead was very dark and looked like a powder-burn, and that for five years he had investigated wounds caused by fire arms and had probably investigated more than a hundred murders and suicides, was asked to state whether he was able to state, from the condition of the wound and the discoloration, where the muzzle of the pistol was with reference to the head at the time it was discharged. He answered that he could not "tell absolutely; I cannot tell in inches where the gun was." Asked for his best judgment, he replied that his judgment from the condition of the wound, was that "the distance was very close to the head, within a foot—twelve inches," and this last answer, over appellant's exception, was stricken out. *Held*, that the witnesses had stated all the facts on which his conclusion was based, the distance from the wound when the pistol was fired was not a matter of expert knowl- edge, the jury could determine the distance as well as could the witness, and no error, certainly no reversible error, was committed in excluding that part of the answer stricken out.

10. ———: **Inference: Happy Life: Conclusions: Waiver.** In a suit on a life insurance policy, where the defense is suicide, testimony that the home of the insured was a very happy one, that he and his wife and children were very devoted to each other, that he was very cheerful and optimistic, and that from observation and experience in seeing him he had a very happy outlook on life, is not to be considered as mere conclusions of the witnesses, but

an inference necessarily involving certain facts which may be stated without the facts, the inference being equivalent to a specification of the facts. And where appellant's counsel, on cross-examination of the witnesses, and of plaintiff and other witnesses, proved the same inferences, the testimony in no way injured appellant's cause, and no reversible error could in any even be predicated upon its admission.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

Affirmed.

*J. C. Rosenberger* and *McVey & Freet* for appellant.

(1) The insurance contract was made, executed and delivered in the State of California, and is governed by the laws of California. The law of that State was duly pleaded and proven. (a) The policy contains the following provision: "If insured shall commit suicide within one year from the date hereof this policy shall be null and void." This condition is valid under the law of California. Dennis v. Union Mutual Life Ins. Co., 84 Cal. 570. (b) The policy was issued July 11, 1914, and the insured committed suicide February 10, 1915; within one year from date of the policy. (2) This case is to be considered under the following rule, viz.: "When the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the court as one of law." Brunswick v. Accnt. Assn., 278 Mo. 154, 273, 213 S. W. 50, quoting with approval from Agen v. Ins. Co., 105 Wis. 218, 80 N. W. 1020; Mockowik v. Ry. Co., 196 Mo. 550, 567; Richey v. Woodmen, 163 Mo. App. 235; Newland v. M. W. A.,

168 Mo. App. 311; Howes v. Trav. Men's Assn., 241 Fed. 278; 7 Cooley's Briefs on Ins., 3264; Hardinger v. Modern Brotherhood, 103 N. W. (Neb.) 74. Mere surmise and conjecture, unsupported by evidence, affords no valid ground for a verdict. Spiro v. Transit Co., 102 Mo. App. 250, 262; Bates County Bank v. Ry. Co., 98 Mo. App. 330; More v. Ry. Co., 28 Mo. App. 622; Peck v. Ry. Co., 31 Mo. App. 126; Roberts v. Ry. Co., 56 Mo. App. 64. (3) The presumption against suicide has no place in the presence of the actual facts. The presumption ceased to exist in the face of plaintiff's story of the suicide. (a) As the facts were established by the undisputed testimony; by plaintiff's own evidence and admissions, this court, in determining whether suicide was established as a matter of law, will not take into account the presumption against suicide. Mockowik v. Ry. Co., 196 Mo. 550, 571; Guthrie v. Holmes, 272 Mo. 215; Brunswick v. Accident Assn., 278 Mo. 154; Andrus v. Business Mens' Acc. Assn., 223 S. W. 74; Packing Co. v. Railroad Co., 196 S. W. 406; 1 Jones on Evidence, sec. 10-F, p. 74; Galpin v. Page, 85 U. S. 350, 365, 21 L. Ed. 959; 9 Ency. Evidence, sec. 6, p. 885; Erhart v. Dietrich, 118 Mo. 418; Myers v. City of Kansas, 108 Mo. 480; Winter v. K. of P., 96 Mo. App. 1; Moberly v. K. C. Ry. Co., 98 Mo. 183; Keller v. Over, 136 Pa. St. 20; Supreme Tent v. King, 142 Fed. 678. As the presumption against suicide has no place in the consideration of the evidence, this appeal is to be determined by the same rules which apply to the ordinary inquiry on appeal as to whether the plaintiff has made a case for the jury, i. e., whether suicide was established as a matter of law. And that rule is as expressed in the authorities cited in point. (4) The undisputed evidence clearly established suicide as a matter of law, and the court erred in refusing defendant's requested peremptory instruction and erred in submitting the case to the jury over the objections of the defendant; and erred in overruling defendant's motion for new trial, and especially paragraphs

1, 2, 6-11, and erred in overruling defendant's motion in arrest of judgment. (a) The verdict is the result of passion and prejudice on the part of the jury. (b) The verdict in this case is without the slightest evidence to support it. It is a travesty on justice; the overthrow of reason; the clear result of passion and prejudice on the part of the jury, and without legal cause or excuse. (c) There is no theory of accident based on the evidence, or to be inferred from the evidence, which the reasonable mind of this court can for a moment entertain. Richey v. W. O. W., 163 Mo. App. 235, 247. (d) There is no conflict in the evidence; it all points clearly and unmistakably to death by suicide. Any other conclusion would outrage all reason. To reach any other conclusion one must go outside of the record and resort to fanciful conjecture or speculation, which is not permissible. Hardinger v. M. B. A., 103 N. W. 74; Agen v. Ins. Co., 105 Wis. 217, 80 N. W. 1020. (5) The court erred in giving in charge to the jury plaintiff's requested instruction number one. (a) It was the duty of the court to clearly and fairly present the issue of suicide, which was the only issue in the case. This was not done in the instruction. It directed the jury's attention to feigned and false issues, and away from where the shoe actually pinched. It belittled, subordinated and submerged the issue of suicide and made of feigned issues the prominent and controlling issues, and diverted the mind of the jury from the real and only issue, i. e., that of suicide. The defendant was entitled to a fair presentation of that issue, and was entitled to have the jury's mind focused on and not diverted from the issue of suicide. The instruction was most prejudicial and the giving of it was flagrant error. Strother v. Milling Co., 261 Mo. 22. (b) The definition of "burden of proof" is erroneous. It is the definition of "preponderance of evidence." This error was prejudicial. (c) The plan of obscuring the issue by putting something else forward to talk about is no

working theory in the administration of justice. Strother v. Milling Co., 261 Mo. 22; Sooby v. Postal Tel. Co., 217 S. W. 877; Ins. Co. v. Walker, 67 Ark. 147. (d) Where the evidence renders it doubtful in the mind of the court as to whether the verdict was right the instructions given must be accurate. Black v. Black, 190 Ill. App. 559; Foley v. Ry. Co., 179 Mich. 586; St. Louis Elec. Ry. Co. v. Groves, 97 S. W. 1084; City of Lafayette v. Ashby, 8 Ind. App. 214. (e) Defendant's instructions cannot be relied upon to cure errors in plaintiff's instructions. (6) The court erred in excluding competent, relevant and material evidence offered by the defendant. (a) Admissions against interest made by plaintiff to her maid Anna Williamson, wherein plaintiff stated that her husband had committed suicide. The court erroneously held that the statement that Parker committed suicide, was merely an opinion and conclusion of the plaintiff, and hence incompetent. The evidence was competent, and its exclusion was prejudicial error. (b) Exclusion of the evidence of expert witness Cato that, judging from the powder burns and the wound, the revolver, in his opinion, was discharged close to the head of the deceased. The court erroneously held that the question called for a speculative conclusion and was incompetent. (7) The court erred in admitting in evidence over the objections of the defendant, the conclusions and opinions of witnesses as to the happy home life, mental state or state of mind of the deceased, and his disposition.

*Haff, Meservey, German & Michaels* and *Humphrey, Boxley & Reeves* for respondent.

(1) There was no proof that the insured committed suicide; on the contrary the great preponderance of the evidence showed the death to have been accidental; and appellant's request for a peremptory instruction was properly overruled. Reynolds v. Casualty Co., 274 Mo.

83; Prentiss v. Ins. Co., 225 S. W. 695; Brunswick v. Cas. Co., 278 Mo .154; Andrus v. Accident Assn., 223 S. W. 70; Gooden v. M. W. A., 194 Mo. App. 666; Printz v. Miller, 233 Mo. 47; Supreme Lodge v. Beck, 181 U. S. 48, 45 L. Ed. 741; Home Ben. Life Assn. v. Sargent, 142 U. S. 691, 35 L. Ed. 1160; Tuepker v. W. O. W., 226 S. W. 1002; Remfry v. Ins. Co., 196 S. W. 775; Grey v. Forresters, 196 S. W. 779; Pagel v. Cas. Co., 158 Wis. 278, 148 N. W. 878; Bacon on Life & Accident Ins. (4 Ed.), sec. 438.    (2)  The court did not err in giving respondent's instruction number one.  Morgan v. Mulhall, 214 Mo. 451, 462; Stewart v. Mason, 186 S. W. 578; Printz v. Miller, 233 Mo. 47; Brown v. Assurance Co., 45 Mo. 221; Brown v. Assurance Co., 45 Mo. 221; Keeton v. National Union, 182 S. W. 798; Lange v. Mo. Pac. Ry. Co., 208 Mo. 478; Owens v. Railway, 95 Mo. 181; Colburn v. Krenning, 220 S. W. 934; Meadows v. Ins. Co., 129 Mo. 97; Sonnen v. St. L. Transit Co., 102 Mo. App. 271; Burton v. Ins. Co., 96 Mo. App. 204; Burgwyn v. Whitfield, 81 N. C. 261; Berry v. Railroad, 214 Mo. 593, 604; Ellis v. Met. St. Ry., 234 Mo. 679; Patterson v. Evans, 254 Mo. 304; Reynolds v. Casualty Co., 274 Mo. 83, 86; Mockowik v. Railroad, 196 Mo. 550, 568.  (3) The court did not err in excluding certain questions asked witness Williamson.  Baker v. Contr. Co., 223 S. W. 45; Meeker v. Met. St. Ry., 178 Mo. 187; State v. Brennan, 75 Mo. App. 176; Stephenson v. Atlantic Co., 230 Fed. 20; Hicks v. H. & St. J. Ry., 68 Mo. 329.  (4) The court did not err in sustaining objections to certain questions asked witness Cato.  Gavish v. Ry., 49 Mo. 274; Railway v. Stock Yds., 120 Mo. 541; Koenig v. Railroad, 173 Mo. 698; Benjamin v. Railroad, 133 Mo. 274; Lee v. Knapp, 155 Mo. 610; McAnany v. Henrici, 238 Mo. 103; Helfenstein v. Medant, 136 Mo. 595; Bradley v. Ry., 64 Mo. App. 475; Gates v. Ry., 44 Mo. App. 488; 22 C. J. 536; Kerr v. M. W. A., 117 Fed. 593; Inghram v. National Union, 103 Iowa, 395.  (5)  It was not error to admit evidence of deceased's health, disposition, state of mind, and home

life. Laessig v. Protec. Assn., 169 Mo. 272, 274, 276; 1 C. J. 499; 2 Bacon on Benefit Soc. & Life Ins. (3 Ed.) sec. 336A; Prov. Assn. Soc. v. Whayne, 93 S. W. 1049; Com. v. Trefethen, 157 Mass. 309; Reynolds v. Cas. Co., 274 Mo. 91; Pfeiffer v. Sup. Tribe, 191 Mo. App. 38; Bowman v. Acc. Co., 124 Mo. App. 477; Hunt v. Order of Pyramids, 105 Mo. App. 41; Kerr .v. M. W. A., 117 Fed. 593; Mut. Life v. Miller, 92 Fed. 63; Met. Ins. v. Maddox, 127 S. W. 503; Mut. Life v. Tillman, 84 Tex. 31; Furbush v. Cas. Co., 131 Mich. 234; Fulton v. St. Ry. Co., 125 Mo. App. 239, 244; 12 Am. & Eng. Ency. Law (2 Ed.), 490; Eyerman v. Sheehan, 52 Mo. 221; Partello v. Ry., 217 Mo. 645, 655; 1 Wharton on Evidence (3 Ed.), sec. 510; Reardon v. Ry., 215 Mo. 137; Schultz v. Ins. Co., 152 Wis. 537; Morrison v. State, 40 Tex. Crim. 473, 51 S. W. 358; Pullman Co. v. Hoyle, 52 Tex. Civ. App. 534, 115 S. W. 315; State v. McKnight, 119 Iowa, 79, 93 N. W. 63, 64; Miller's Est., 36 Utah, 228; Ry. v. McLendon, 63 Ala. 275; 22 C. J. 614; Cady v. F. & C. Co., 134 Wis. 322, 17 L. R. A. (N. S.) 260; Bank v. Noel, 94 Mo. App. 498; Hicks v. Ry., 68 Mo. 329; Warwick v. Elsey, 47 Mich. 10; Roe v. Kansas City, 100 Mo. 190; State v. Brennan, 75 Mo. App. 172; Meeker v. Met. St. Ry., 178 Mo. 173, 187; Baker v. Contrac. Co., 223 S. W. 45; Griebel v. Ry., 88 N. Y. Supp., 767.

SMALL, C.—Appeal from the Circuit Court of Jackson County.

This was a suit to recover $20,000, and interest, the amount of a life insurance policy issued by the defendant company, July 11, 1914, upon the life of Carl S. Parker, in favor of his wife, Susan A. Parker, the plaintiff. The policy was issued in the city of Los Angeles, California, where the insured and his family then resided. The insured died from a gun-shot wound at his home in Los Angeles on February 10, 1915.

The answer was, first, a general denial, and that the insured committed suicide, in contravention of a pro-

vision in the policy, "that if said Carl S. Parker should within one year from July 11, 1914, the date of the policy, commit suicide, while sane or insane, then said policy should be null and void, and defendant should not be liable thereunder." That on February 10, 1915 , within said one year from the date of the policy, the said Carl S. Parker did commit suicide by firing with his own hand a bullet from his pistol into his brain. There was a further allegation in the answer, that under the laws of California, where the contract was made and the assured and beneficiary lived, and where the assured died, such a clause in the policy against suicide, sane or insane, was valid, and a breach thereof avoided the policy. Also, that a part of the premium, $540.40, remained unpaid.

The reply put the affirmative defenses in issue.

The plaintiff offered the policy in evidence, a premium receipt, showing that the premium was paid until the 11th day of January, 1915. (The next premium was due the next day after insured's death). Defendant's counsel then admitted the insured's death and that defendant was making no point that notice of death was not given in due form. Plaintiff also introduced in evidence a letter from defendant, dated May 8, 1916, stating that defendant did not forward any blanks upon which Susan A. Parker could make proof of the death, for the reason that the policy had become absolutely null and void by reason of the suicide of the insured. Plaintiff then rested.

Defendant then introduced its evidence, after which, plaintiff offered evidence in rebuttal.

The salient facts, which the evidence tended to prove, are substantially, as follows:

The insured was about thirty-eight years of age, married, and had three children—two girls, seven and eight years old, and a boy eleven years. He had lived in Los Angeles about eight years. His home life seemed to be of the happiest. He was a most kind and affectionate son, husband and father. He was in good health, and

a fine specimen of man—full of life and energy—his associates testifying to his great capacity for work, his kindliness to and thoughtfulness of others, and that he was about the "best salesman in Los Angeles." But he was a "good fellow" and sometimes addicted to drink, but not enough to make any impression on his health or strength. He was, in other respects, a man of good habits and orthodox in religious belief. He was in the wholesale plumbing-supplies business, which had prospered until within a comparatively short time before his death, when, on account of the World War, business had fallen off, and he and his associates had considered the advisability of buying or selling out to a competitor. He left home on the morning of his death, February 10, 1915, in his usual happy and cheerful frame of mind, to meet such competitor. They were together negotiating all day, and the result was that his company agreed to buy out the the other company, and to pay them the inventory price of their goods, about $40,000, in equal payments, in three, six, nine and twelve months after date. The deal was closed sometime in the afternoon. In the meantime, they had taken lunch together and also quite a number of drinks of intoxicating liquor. Defendant's evidence tends to show that they took more drinks afterwards, perhaps as many as eight or nine up to about six o'clock that evening, when Parker accompanied Col. Lally, president of the competing concern which they had bought out, to his train for San Francisco, where he resided. At that time, Parker was somewhat "lit up," as Col. Lally testifies, but went with him to his car and tapped on the car-window and waived him good-bye in the best of spirits. As he left the depot, Parker became somewhat playful and jostled one of the "red caps," who became angered, and Parker gave him a dollar to make amends. From the depot, he was driven to a hotel, where he got shaved, and from there started home in a taxi, but stopped on the way at the California Club, where he drank some champagne, and his friend

Leeds, who declined to drink with him, suggested to him to take a room and rest a while, before going home, so he could be sobered up a bit. But he refused, and with the assistance of his friend got into a taxi and drove home, where he arrived about 7:20 p. m. He and Mrs. Parker had accepted an invitation to dine that evening at the house of a friend at seven. Mrs. Parker was dressed and waiting and watching for him, when the taxi arrived, and met him at the curb. She observed that he had been drinking, and said to him that it was too late to keep their engagement for dinner. The taxi driver says that she upbraided him in a somewhat angry manner, while she says she only requested him to alight and go into the house with her, when he insisted on going to dinner to their friend's house, "as he was." What happened afterwards, is graphically described by appellant's learned counsel in their brief, as follows:

"She after a time persuaded her husband to get out of the taxi and into the house. He took off his coat and hat in the hall. They went upstairs into their bed room, and she turned to the telephone in the room to call her friends and cancel the engagement. While at the phone she turned and saw her husband standing in front of the chiffonier, looking into the mirror. He held a revolver in his right hand; a pistol which he had placed in the chiffonier drawer on an occasion some two or three weeks before. She screamed, rushed to her husband, snatched the revolver from his hand and ran with it into the hall-way. He followed; overtook her in the hall; caught hold of her roughly and threw her down. In the struggle for possession of the revolver she managed to toss it over the banisters on to the stair-landing below. Parker immediately let go his wife and ran to the stairway to secure the revolver. In his haste or owing to the struggle, he slipped or lost his balance and slid down the stairs on his back, feet in air, bringing up on the landing on top of the revolver. Attracted by the screams of Mrs. Parker, a maid (Anna Williamson) ran from the rear into the front

hall downstairs. She saw Parker fall; saw him get up, pick up the revolver and come rapidly down, and thinking he needed assistance she started toward him, but he pointed the gun toward her; she saw the revolver; saw his flushed face, set features and staring eyes, and she instinctively screamed and ran. Parker came on. The wife followed. He turned with the pistol and threatened her, but she still came on. He ran out from the hall and into the dining room, she chasing him, running as fast as she could. He went on through a swinging door into the pantry; the door came to and she could not pass. She pounded on the door frantically with her fists; an instant, and then the shot. She pulled open the door, leaned over the fallen body of her husband, saw a bullet hole, marked with powder burns, in the middle of his forehead; saw the revolver loosely in his right hand; saw that her husband was gone, and fled, screaming, to the neighbors.''

The only other witness who saw Parker just before the tragedy was the maid, Anna Williamson, a witness for the defendant, who testified:

''When I arrived at the front hallway I saw Mr. Parker on top of the stairway, and he fell just as I came. He fell on the top stairs and fell to the second landing from the bottom. He slid down the stairs on his back. On reaching the landing he picked up something; at first it looked to me like a piece of wood, and I ran towards him and tried to help him down and I saw it was a revolver, and I ran back to my room again. Mr. Parker didn't say anything. I was frightened because I knew Mr. Parker was in a condition he didn't know what he was doing because of liquor, and I ran because I was afraid he might do bodily harm to me. Mr. Parker was not like himself. He looked like a man under the influence of liquor. His eyes were very staring and face very red; I had never seen him in that condition before. No, he didn't point towards his face; the revolver was more direct at me but I don't think he intended to point at —he just held it that way; I don't know whether he

intended pointing at anything or not, he was not pointing in any way towards me. Well, think the way he held it it was more pointing to the ceiling. Could not tell correctly what he was pointing at. My thought was he was carrying the revolver very carefully as he went out through the hall, holding it up so that it was not pointed at anybody, but rather holding it up so that it was out of the way, so that it could not hurt me or him or anybody else. That is the way it appeared to me.

"Q. I will ask you if Mrs. Parker did make the statement to you that she thought her husband had committed suicide because he was temporarily insane; did she make that statement to you? A. Yes. I think it was the very first evening, when I was undressing her. When she made these statements she talked as a sane person, but was very excited and nervous."

Shortly after his death, several neighbors and others arrived, and they testified for defendant, as to the position and condition of the body. One (Mr. Huntsberger) said that there was a bullet hole a trifle to the right of the center of the forehead, and a great deal of blood on the pantry and dining-room floors. The bullet hole was midway between the hair line and the eye brows, and there was a slight blackened appearance in the vicinity of the bullet hole, which seemed due to powder burns. The revolver was lying on the floor near his right hand, one chamber was exploded, and the others all loaded. He was lying partly on the left side of his face and body—not quite flat on his face or chest, but more on his chest than his side, his face mostly inclined towards the floor. His right arm seemed to be a little out from his body. He seemed to be lying partly on his left arm. Witness had an indistinct recollection that there was an aperture on the other side of his head towards the base of the brain, but was not clear about that.

Another witness for defendant ( a police officer) said: He was lying on his back, his head holding the

swinging door between the dinning room and pantry open four or five inches, and the revolver lay in his open right hand with the handle between the thumb and forefinger. The bullet hole was in the right temple, and the wound looked like a powder burn. The revolver was a double-action, hammerless revolver. "You pull the trigger and it cocks itself, and you pull further and it discharges—by pulling the trigger, it would cock and then fire. One movement back cocks and discharges it." He could smell liquor very prominently about the body.

Another witness for defendant (Dr. Smith) said that the bullet hole was in the forehead; did not remember the exact location—but it was in the forehead between the hair line and the eye brows and between the two temples.

As to the admissions of Mrs. Parker, that her husband committed suicide, testified to by defendant's witnesses: The maid (Anna Williamson) said that after Parker's death, the same night, Mrs. Parker told her she took the revolver away from him, because she thought he would kill himself; that he was standing in the front of the chiffonier looking-glass, and she thought he was going to kill himself right there, and that he looked in the glass to see where to point the revolver.

Three neighbors (the Huntsbergers) testified that Mrs. Parker, when they arrived shortly after the occurrence, kept repeating, "Oh! Why did he do it? Why did he do it?" But they all say, in effect, that she was in an hysterical condition. The maid says she was very much disturbed up to the time of the funeral, and then she collapsed, and was in bed, and was not herself until May following, but that when she made the statement that she thought her husband was going to kill himself, she looked like a sane person, but was "very much excited and nervous."

Defendant also introduced in evidence proofs of death made to the Penn Mutual Insurance Company, dated March 2. 1915, signed and sworn to by Mrs. Park-

er, which stated that the cause of death was suicide, and had attached thereto the certificate of the attending physician, Dr. Guy Cochran, stating that the deceased died by his own hand, and that he believed it must have been an acute mania, also stating that deceased always appeared well, but had been working very hard, and that he had been told by his wife that he had been worried about his health and suffering from severe headaches and sleeping badly. There was also attached to this proof of death, a copy of the coroner's verdict, which stated the coroner found from the testimony adduced before him that Parker came to his death by a ''gun-shot wound in the head, suicidal.''

Paul D. Robinson testified for defendant, that he was the funeral director, and called the next morning. That he had difficulty in getting Mrs. Parker to talk. About all she would say, at first, was, ''What did he do it for?'' That afterwards he understood her to say that he picked up the gun and said, ''Well, I'll end it all,'' or words to that effect. That she was, however, ''exceptionally hysterical, and was in a very, very nervous condition, and did not act like herself at all.'' She told him that her husband had been examined by some physician, who told deceased he had a cancer or something. But the witness examined the body, and there was no sign of cancer, nor was it an alcholic body.

Mr. Baker, a friend of the family, testified for plaintiff that Mrs. Parker told them that Parker had killed himself, but she did not use the word ''suicide.''

Mrs. Baerthlein testified, for defendant, that she was there the night of Parker's death, and Mrs. Parker was very hysterical.

The plaintiff, Susan A. Parker, testified in her own behalf, in rebuttal. We have detailed, in substance, the greater part of her testimony in the extract which we have heretofore made from the statement contained in appellant's brief. But there are some additional matters in her testimony bearing on the case. She said:

"There was blood on the inside of the pantry door, the side he was on. It was so far up from the bottom of the door that, when the cook washed it off, she had to reach up." (Parker was six feet and one and a-half inches tall). She had a trained nurse the night of Parker's death to take care of her. She did not remember any conversation that occurred that night. "Oh! I don't know what I said." She went to the funeral in an automobile, but was not out of it, and was carried into the automobile. She was in bed after the funeral, and had a trained nurse until about April 1st. All she knows of her physical and mental condition during that time is that she didn't know much. Asked about her condition at the time of the proofs of death to the Penn Mutual Insurance Company, dated March 2, 1915, introduced in evidence by the defendant, she said: "At that time, I couldn't have read anything that was given me. My nervous condition was such that I couldn't read. I did not read anything; I couldn't. I do not know whose writing this is upon here (indicating the Penn Mutual Insurance Company's papers). It is not my writing. I did not authorize any person in the world to make those entries here. I mean this writing above my signature. I never authorized Dr. Guy Cochran to make entries in this document which purport to have been made by him under the heading, 'Attending Physicians' Certificate.' I never saw this writing (Penn Mutual Insurance Company's Proofs of Death) until now. Never authorized anyone to make any attachments (to said papers). Dr. Cochran was not at my home prior to March 2, 1915, or prior or subsequent to March 1, 1915. I never told Dr. Cochran or Mr. Baerthlein or anybody else, that my husband committed suicide. If I had known that any such statement was in there, I would not have signed that document. . . . I never saw Dr. Cochran that I didn't ask him to please get Carl not to work so hard. Mr. Parker did not have any cancer. . . . Mr. Parker did not appear to be worried about anything; nothing

special; he always took business seriously." She ran after Parker, she supposed, from instinct. "I didn't think a man who had even one drink had any business with a revolver in his hand." "Q. You thought there was a situation of danger? A. Naturally, when you see a man with a revolver in his hand, he is not doing it for pastime."
"I signed several papers when I was ill; I didn't know what they were. I stayed in bed and had a physician, Dr. Guy Cochran. He had been our physician for a long time since we went to Los Angeles. He was one of the best known physicians in Los Angeles. Don't remember of making a claim on the Penn Mutual, but remember there was a policy in that company." Mrs. Parker further testified that Parker never said a word from the time he left the taxi-cab until his death. The maid (Anna Williamson) says, he never said a word while she saw him, but "kept his lips closed tight."

The probate court records showed that his estate was a little more than solvent—paid all his debts, some $18,000, in full (except about $1,000 due his wife); paid some $2,400 to his family, and about $1,200 administrator's fees and attorneys' fees. There were uncollected assets of unknown value turned over to the wife to apply on balance due her.

There were some objections to the admission and refusal of testimony, which will be referred to in the opinion.

At the close of the testimony, the defendant requested the court to instruct the jury "that under the law and the evidence, your verdict must be for the defendant," which the court refused.

The court gave the following instructions for the plaintiff:

"1.  The court instructs the jury that if you find and believe from the evidence in this case that the policy in evidence was issued to Carl S. Parker, and that all premiums required by said policy to keep said policy in force until February 11, 1915, had been paid; and that

Carl S. Parker died February 10, 1915, and that defendant refused to furnish to plaintiff forms for proofs of death and denied any liability on the policy, then you must find a verdict for plaintiff for the face amount of said policy ($20,000) less the sum of $540.40 (the amount of two quarterly premiums), upon which balance you should compute interest at the rate of six per cent per annum from such date of the denial of liability, if you so find, unless you should further find and believe from the evidence that Carl Parker committed suicide, and upon that question the court instructs you that the burden of proof is on defendant to prove that he did commit suicide.

"By burden of proof as used in this instruction is meant the greater weight of the credible testimony in the case.

"2. The court instructs the jury that you are the sole judges of the credibility of the witnesses and the weight to be given to their testimony."

At the request of the defendant, the court gave the following instructions:

"3. In instructing you as to the law of this case, the court admonishes you that you have an important duty to perform in carefully weighing and considering the evidence and applying the law as it shall be given to you in the instructions. You will fail in your duty if you should not look to all the proof and consider it fully, fairly and impartially, and with but one purpose, namely, to arrive at the truth and to do equal and impartial justice, looking only to the law and the proof. You should not allow yourself to be influenced by the fact there is an individual on one side and an insurance company on the other, and it is your duty to put out of your minds any feeling of sympathy, prejudice or partiality for one side or the other. Their rights are equal and the same under the law, and the jury should remember nothing but the law and the evidence are to determine the issues involved. You should satisfy your-

selves, before returning a verdict, that you fully understand the law and the proof upon which you base your verdict, as your oath places upon you the duty of finding and returning a verdict according to the law and the evidence, and that alone. The rights of the parties under the issues made are submitted to you for your honest determination, and you should weigh and consider all the questions submitted without any feeling of prejudice or partiality one way or the other, and with an honest purpose to reach a correct conclusion under the law and the proof. No juror should assent to a verdict that he does not conscientiously believe a correct one according to the law and the proof. You should discuss among yourselves the matter submitted dispassionately and with minds open to reason and conviction, after the argument of counsel has been heard, without getting up unreasonable antagonism that might interfere with a just, fair and proper consideration of the case. If any juror should happen to know any fact bearing upon this case, either directly or indirectly, he should not act upon it nor communicate it to his fellow jurors. The law requires you to discuss and rely alone for your verdict upon the sworn testimony adduced, and under the law as given you in these instructions.

"4. The court instructs the jury that by the policy sued on it was agreed between Carl S. Parker and defendant that the policy would be null and void if he, the said Carl S. Parker, should commit suicide, while sane or insane, within one year from the date thereof, and such agreement, under the law of this case, is binding on the plaintiff in this suit.

"Therefore, if you believe from the evidence that said Parker committed suicide, while he was either sane or insane, then plaintiff is entitled to nothing under the policy and your verdict must be in favor of the defendant.

"5. If you believe from the evidence that Carl S. Parker for the purpose of ending his life, fired a pistol

bullet into his brain and killed himself, then under the law, it is your sworn duty to return a verdict in favor of the defendant, whether you believe he was sane or not at the time of the act.''

The jury returned a verdict for plaintiff for $22,602.33, which was the full amount of the policy, less $540.40 unpaid on the first year's premium, and set up in the answer.

Defendant's motion for new trial being overruled, it appealed to this court.

I. It is not disputed, that the provision in the · policy that it should be void in case the insured committed suicide, was a valid provision, because the substantive rights of the parties are governed by the laws of California, where the parties resided, the policy was made and delivered, and the insured died, and there was no statute in that State prohibiting or making void such a provision in the policy. [Prentiss v. Ins. Co., 225 S. W. (Mo.) ,695.]

II. But the burden of proof that insured committed suicide was upon the defendant. Suicide was an affirmative defense and was necessarily so pleaded by defendant. The suit was on an ordinary life policy, and not upon an accident policy. So that the manner of the death of the insured—that it was not accidental, but designedly by suicide—was incumbent upon the defendant to allege and prove. In the Century Dictionary, suicide is defined: ''1. The act of designedly destroying one's own life.'' And that: ''To constitute suicide at common law, the person must be of years of discretion and of sound mind.'' But no question is raised as to the sanity of the deceased at the time of his death, nor as to the validity of the provision that suicide, sane or insane, should avoid the policy. Still, in order to be suicide at all, death must have been *designedly,* and not accidentally, inflicted upon himself by the deceased. These propositions are not disputed by either party and are simply

Suicide: Burden of Proof.

referred to to show that they are assumed to be true in the consideration and decision of this case.

III.  In view of the burden of proof being upon the defendant to prove suicide, sane or insane, under the facts and circumstances in the record in this case, we cannot rule that, as a matter of law, such defense was made out and that the lower court erred in not instructing the jury to return a verdict for the defendant.

*Circumstantial Evidence.*

In this case, the evidence, as to the manner of the insured's death, is wholly circumstantial, and it is well settled in this State, that where the evidence is wholly circumstantial, suicide cannot be declared by the court, as a matter of law, unless such circumstances exclude every reasonable hypothesis, except suicide. [Brunswick v. Standard Ins. Co., 278 Mo. 154; Reynolds v. Casualty Co., 274 Mo. 83; Prentiss v. Ins. Co., 225 S. W. 695; Andrus v. Accident Assn., 283 Mo. 442, 223 S. W. 70.]

IV.  But learned counsel say that the evidence in this case is not all circumstantial, because there is evidence that plaintiff herself admitted that insured committed suicide.  The answer to this is, that she denied that she ever told anyone that he committed suicide.  Furthermore, her admissions to that effect in the proof of death to other companies and otherwise, if made, were but conclusions from the circumstances surrounding insured's death, stated by her; but such circumstances being also before the jury, her conclusions were not absolutely binding upon the jury, and it was the duty of the jury to arrive at the ultimate fact as to whether or not insured did commit suicide, from all the facts and circumstances in evidence, including, as one of the circumstances, the admissions, if any, so made by the plaintiff.  The weight to be attached to such admissions, in view of her condition, mental and physical, at the time she witnessed the details of the trag-

*Plaintiff's Admissions.*

edy and when she is said to have made such admissions, was also a matter for the jury. In this connection, what is said by Justice BREWER in Supreme Lodge v. Beck, 181 U. S. l. c. 56, is apposite: "The plaintiff in her proofs of loss stated that the deceased came to his death by suicide, and to that effect was the verdict of the coroner's jury. With respect to this matter the court charged that there was no estoppel; that the plaintiff could explain the circumstances under which she signed the statement, and that while standing alone it would justify a verdict for the defendant, yet if explained and the jury were satisfied that the death did not arise from suicide, she was not concluded by this declaration. We see no error in this ruling. None of the elements of estoppel enter into the declaration. The condition of the defendant was not changed by it, and if under a misapprehension of facts she made a statement which was not in fact true, she could explain the circumstances under which she made the statement and introduce testimony to establish the truth."

So that all the evidence as to whether or not the deceased committed suicide, was circumstantial.

V. Such being the case, can it be said that all reasonable men would agree that the undisputed facts and circumstances in this case exclude every reasonable hypothesis except suicide? Or, as stated in the **Other Reasonable Hypothesis.** Brunswick Case, 278 Mo. l. c. 173: Are they "such and of such weight as to negative every reasonable inference of death by accident?" Tested by that rule and by the precedents in this State, we must answer in the negative.

There was no evidence of previous threats of suicide and no motive for it in his family or business relations. He had in fact that very day consummated the purchase of a competing establishment, which gave his business, which had begun to languish, owing to the World War, a new lease of life. This shows his intention to press forward in the race of life with more energy,

courage and confidence, than before. Upon the consummation of this deal, probably in celebration of it he overindulged in the flowing bowl and lost control of himself and his actions.

He said no word, and never aimed the pistol at himself, from the time he entered the house until he entered the pantry. The pantry door shuts out from view the exact manner in which the pistol was discharged, and prevents any definite knowledge from reaching us whether he did or did not commit suicide. It is mere speculation—but the circumstances of the blood on the pantry door about even with his head, that the wound was in the center of the forehead and not in the right temple, are consistent with the pistol, which needed no cocking, but only a pull on the trigger to explode it, going off accidentally, while he in his unsteady mental and physical condition, obstructed his wife's entrance to the pantry, by holding or trying to hold, with the pistol in his hand, the swinging and swaying door against her, and upon which she was pounding with her fists.

But appellant's learned counsel insist that, because Mrs. Parker made frantic efforts to secure the weapon, and he apparently made equally frantic efforts to take it from her, and secured it against all her efforts and protestations, that it is conclusive to reasonable minds that he intended to secure it for the purpose of committing suicide. This leaves out of the problem the important feature that he was intoxicated and all antecedent circumstances, as well as the strong presumption of fact against suicide. In his hilarious condition at the railway station, he playfully, but perhaps roughly, jostled the "red cap" and assauged his wounded feelings with a dollar. Who can prophesy what vagaries or rough, reckless or wild pranks he might indulge in when he reached home after drinking more champagne at the California Club? Nor is the fact that the plaintiff pursued him frantically to take the revolver from him, conclusive that she even thought he would commit suicide, that is, de-

signedly and purposely take his own life. As the plaintiff says, she might have instinctively rushed forward, because she was greatly frightened, and she did not know but that he might injure himself, because, as she said, "a man, who had even one drink, has no business with a revolver in his hand," and that, "naturally, when you see a man with a revolver in his hand, he is not doing it for pastime." So it appeared to the maid, that he was holding the revolver up toward the ceiling in such a manner as not to hurt her, himself, or anybody else, as he went through the hall to the dining room; but she fled from him, because he had a revolver and was in liquor and did not know what he was doing, and, therefore, might injure her.

Of course, there was evidence, in this case, of suicide sufficient to go to the jury, but it was far from that conclusive character which authoriizes the court to declare, as a matter of law, that the defense of suicide was sustained.

We have some notable cases in this 'State. In Reynolds v. Casualty Co., 274 Mo. 83, the evidence was much more conclusive of suicide than in the case at bar. In that case, the deceased was a traveling salesman. He went to a hotel, registered under an assumed name, asked for a well-lighted room on one of the upper floors, but there being none, took a room on the first floor above the lobby. The next morning he was found dead in the bath room with the door locked, his body lying on the floor, a Colt automatic pistol was found in the bowl of the washstand near by, above which was a looking-glass; two shells had been exploded, and one ball was embedded in the bath room door about five feet and a-half from the floor. There was one bullet hole in the back of the head near the base of the skull, another in the lower part of the forehead between the eyes, another in the cheek near the lower jaw. It was strongly urged in that case that two shots having been fired and taken effect in the head of the deceased, the proof of

suicide was conclusive. Yet, this court held that owing to the strong presumption against suicide, based upon the strong love of life in every human being, it was a question for the jury, whether the deceased purposely or accidentally killed himself.

In Brunswick v. Ins. Co., 278 Mo. 154, the tenth paragraph of the syllabus fairly states the facts and ruling of the court, as follows: "Where defendant put in no evidence at all, and no affirmative facts to show suicide were adduced, save and except the proven facts that a few minutes before insured was found in a dying condition, due to his having taken cyanide of potassium, he was seen to fold up a handkerchief, that after his death, a large quantity of this poison was found in the handkerchief in his pocket, and that he had this poison in his pocket for several days, and knew what it was, the court could not say, as a matter of law, that the evidence was sufficient to overcome the presumption against suicide."

In the case in the Supreme Court of the United States of Supreme Lodge v. Beck, 181 U. S. at page 53, the court said:

"Whether the deceased committed suicide was a question of fact, and a jury is the proper trier of such questions. It is not absolutely certain that the deceased committed suicide. The following are the facts, at least from the testimony, the jury was warranted in finding them to be the facts: The deceased and his wife had been married some six years. They had one child, a little girl of whom he was very fond. They lived happily together except when he was drinking, and then he became irritable, and they quarreled. For six weeks prior and up to four days before his death he had not been drinking. The only evidence that he ever thought of taking his life is the testimony of a domestic, who had worked in the family for two or three years but had left a year and four months before his death, that when once she called his attention to the fact that he

was drinking heavily, his reply was that 'a man that has as much trouble as he had, the sooner the end came the better,' and a similar remark at another time, that such a man 'would be better off dead than living.' Two days before his death his wife left her home and went to a neighbor's He tried to persuade her to return, but she refused to do so while he was drinking. There were two guns in his house, one a single-barrel shot-gun, belonging to his wife, and one a double-barrel shot-gun, his own. The domestic then employed had concealed both by direction of Mrs. Beck. The day before the killing he went to a store in the city and hired a gun. He was at home the day of his death, sleeping a good deal. Late in the afternoon he got up and called for his gun, saying he was going hunting. Evidently he got his own gun or the gun he had hired the day before. In the evening he went to the house where his wife was staying and sought admission. A friend was with him. Admission was refused. He became demonstrative, and a call was made for a policeman, who soon came in a hack. The breaking of glass suggested that he had gotten into the house. The policeman went inside, when the hack driver who had brought the policeman, called out that the deceased had gone into the back yard and into a water closet. The hack driver heard him go into the closet, and after a minute or so heard him step outside, and immediately the gun was discharged, and on examination he was found with the upper part of his head shot off. It was so dark that no one saw the circumstances of the shooting. Whether it was accidental or intentional is a matter of surmise. The undertaker testified that there was a mark on the face under the left eye as though the face had been pressed to the barrel of the gun; that there were no powder marks on the face as there would have been had the gun not been held close to the skin. But whether that mark, if it came from the gun, was because he deliberately placed his head on the top of the gun, or, as a

drunken man, stumbled and fell against it, is a matter of conjecture. There was a dispute as to whether, in view of the length of the gun and the shortness of his arm, he could have reached the trigger without the aid of a pencil or piece of wood, no trace of which was found, or indeed looked for. Under those circumstances, it is impossible to say that beyond dispute he committed suicide. The discharge of the gun may as well have happened from the careless conduct of a drunken man as from an intentional act. At any rate, the question was one of fact, and the jury found that he did not commit suicide, and after its finding has been approved by the trial court and the Court of Appeals, we are not justified in disturbing it.''

In the Reynolds Case, 274 Mo. l. c. 101, this court said:

''That firearms are treacherous and dangerous, and that playing with them is liable to result unexpectedly, is proverbial.'' And at page 102: ''There are many ways in which a loaded and cocked pistol might be discharged while pursuing its own erratic course.''

In the case before us, the pistol cocked and discharged itself by simply pulling the trigger. In this case, we have not only the vagaries of a loaded automatic pistol, as in the Reynolds Case, but we have it in the hands of a man whose mind and body were full of vagaries from drink, as in the Beck Case—a dangerous combination and quite as likely to cause death by accident as by design.

We rule, the court properly refused a peremptory instruction for the defendant.

VI. But it is earnestly argued by appellant's learned counsel that, in as much as the facts and circumstances surrounding the insured's death, appear in the evidence, the court in passing, as a matter of law, upon the question of suicide, cannot indulge in the presumption against suicide, because when the facts appear, the presumption vanishes, citing the Brunswick

Presumption.

Case, the Prentiss and other cases decided by this court. But this is a misconception of the rulings in those cases. Both those cases, and the Reynolds Case, rule, that in passing upon the question of suicide, as a matter of law, when all the evidence is circumstantial, the court will do so with the presumption against suicide ever in its mind. All reasonable men would do so. Although we decided in those cases that it would be error for the court to instruct the jury that, as a matter of law, there was such a presumption (the facts and circumstances appearing), still, we have no doubt that it would be entirely proper for counsel in their argument to urge, and for the jury to consider in reaching their verdict, that the love of life is the strongest instinct of a human being, and no man ought to be presumed to commit suicide—not, however, as a matter or presumption of law, but, as a matter and presumption of fact, of such probative force as the facts and circumstances in the particular case would justify and warrant in the opinion of the jury. When the facts and circumstances appear, the presumption against suicide, as a *presumption of law,* disappears, but, as a presumption of fact, it is and must be ever present with all reasonable men whose duty it is to pass on the ultimate fact of suicide or accident, where the evidence is all circumstantial. Such is the doctrine of our decisions heretofore rendered and above referred to and we must adhere to that doctrine.

VII. The objections to plaintiff's instruction numbered 1 are not well taken. They are, that it submitted false issues to the jury, to-wit, whether all premiums required to keep the policy in force were paid, and that defendant failed to furnish blanks for proofs of death, and denied liability on the policy, whereas there was no controversy on these points, for the reason that defendant did not contest the policy on any ground except suicide. Also, that said instruction did not clearly authorize a verdict for the defendant, even in case said Parker committed suicide.

Instruction.

A fair reading of said instruction authorized a verdict for plaintiff *unless* the jury should further find that the insured committed suicide. Two instructions for the defendant required 'a verdict for the defendant, if the jury found he did commit suicide. All the instructions must be read together. When so read, the issue was most clearly presented. There was no contradiction between the instructions. The plaintiff could recover, unless insured committed suicide (that is, unless defendant made good its defense), under plaintiff's instruction; and could not recover, if he did (that is, if defendant made good its defense), under defendant's instructions. For several days evidence had been introduced before the jury on the question of suicide. That issue was so prominent in the evidence and in the instructions, that it could not possibly have been submerged, nor in any way obscured, by the matters which were contained in plaintiff's instruction, which plaintiff was not absolutely required to prove. Said instruction did not divert the jury away from the issue of suicide. Said instruction also properly told the jury "that the burden of proof is upon the defendant that he did commit suicide." And, that "by burden of proof is meant the greater weight of the credible testimony in the case."

The objections leveled at this instruction are not well taken.

VIII. It is true, that the court, on plaintiff's motion, struck out the answer of defendant's witness, Williamson, that she *understood* Mrs. Parker said, the cause of her husband's death was suicide; also sustained plaintiff's objection to the following question: "Q. State whether or not Mrs. Parker told you that her husband Carl Parker had committed suicide;" and, struck out her answer: "A. I *think* she used the word suicide, if I recollect right;" also struck out subsequent answers that said witness *thought* Mrs. Parker had told her that her husband had committed suicide while temporarily insane; and one answer, that she did make such

**Evidence.**

statement to her. But subsequently appellant's counsel asked, and the witness answered without any objections, questions, as follows: "Q. Now, in the light of Mr. Reeve's objections, I will ask you if Mrs. Parker did make the statement to you, that she thought her husband had committed suicide, because he was temporarily insane. Did she make that statement to you? A. Yes." Also, as follows: "Q. And you say, you don't remember definitely whether she made that statement the first night following his death or sometime during the first two weeks following his death. Is that right? A. I think it was the very first evening, but I could not remember correct—I think it was the first evening when I was undressing her. Q. Where were you at the time she made that statement? A. In the bed room."

Most, if not all, the prior rulings of the court against appellant were obviously correct, because the questions were either leading and the answers simply, "I think," or, "I understood." But however that may be, the diligence of counsel for appellant was finally rewarded by securing a positive and favorable answer from the witness to the questions previously ruled out, and, thus, the prior errors of the court, if any, were corrected, and appellant has no ground of complaint here on account thereof.

IX. The witness, Cato, for defendant, who saw the body shortly after death, testified, as follows: That it was very black around the wound. Could not say positively what it was, but it looked to witness as though it was powder burned. The dark color covered an area about the size of a dollar. It gave the appearance of where a man had a severe bruise, and probably a half hour afterwards it was discolored. It was a dark color. It was real dark around the bullet hole. Did not examine the discoloration to determine whether or not it was a powder burn. Witness had a great deal of experience in respect to seeing wounds on persons caused by firearms. Worked

*Distance: Expert's Judgment.*

on the Call Motor for five years investigating. During that time he probably investigated one hundred or more murders and suicides. Witness was then asked, whether he was able to state, from the condition of the wound and its discoloration, where the muzzle of the revolver was with reference to the head, at the time the gun was discharged. "A. I cannot tell absolutely, I cannot tell in inches where the gun was. Q. What is your best judgment? A. My judgment, from the condition of the wound, is that the discharge was very close to the head, within a foot—twelve inches." The last answer, on plaintiff's motion that the question called for a pure conclusion, was stricken out. Appellant assigns error on this action of the court. We think, however, no error was committed. The witness had stated all the facts on which his conclusion was based, and that he could not tell absolutely, nor in inches, how far away the gun was when it was fired. It was not a matter of expert knowledge, and the jury could tell as accurately as could the witness. No error, at least, no reversible error, as to defendant was committed in excluding this evidence. [Kerr v. M. W. A., 117 Fed. 596, (LOCHREN, J.).]

X. Appellant objected to the testimony of Baker, that he considered the Parker home a very happy home, that they were all very devoted to each other; Inference. of Baerthlein, that Parker was very cheerful and optimistic; of Dr. Smith, that from his observation, Mr. Parker had a very happy outlook on life; of Bloom, that from his experience in seeing them, "their life seemed to be the very sweetest." The ground of the objection was, that these witnesses stated conclusions or opinions. But such inquiries do not call for expert opinion, and said opinions on the subject which they relate to, come within the rule that: "That an inference necessarily involving certain facts, may be stated without the facts, the inference being equivalent to a specification

of the facts. . . . In other words, when opinion is a mere short-hand rendering of the facts, then opinion can be given subject to cross-examination as to the facts on which it is based." [Rearden v. Railroad, 215 Mo. 137, and many other cases cited in respondent's brief.] But defendant's counsel, upon cross-examination of Mrs. Parker, himself, proved the matter objected to, as follows: "Q. Mr. Parker was very devoted to you, and you had been devoted to him, and he to his children, and they to him? A. Yes." And defendant's witness, Anna Williamson, upon cross-examination, without objection, testified: "I was in the Parker home for about two years; saw Mr. Parker every day, he appeared to be in good health and always cheerful, and seemed very happy, and this continued as long as he lived; he never looked worried; Mrs. Parker used to speak of him being worried, but he didn't show it in his home, nor in his face; his eyes were always bright and cheerful; he was very kind to his children, and kind to everybody. "Q. What can you say of his home life, after two years of observation upon it, was it one of happiness or otherwise? A. Yes, sir, I think he was very happy, and I didn't see anything else. They were very kind people to work for, and Mr. Parker was certainly a kind man in his home, and very kind to his children, and he was always home, and when they went out they went out together."

So that, the testimony objected to in no way injured the cause of the defendant and no reversible error could in any event have been predicated upon its admission.

Finding no reversible error in the proceedings of the lower court, let the judgment be affirmed. It is so ordered. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur.