**TWIN CITY HARDWOOD LUMBER CO. v. DREGER et al.**

No. 14606.

United States Court of Appeals
Eighth Circuit.

Oct. 23, 1952.

Thomas E. Sands, Minneapolis, Minn. (Johnson, Sands, Brumfield & Maloney, Minneapolis, Minn., on the brief), for appellant.

P. J. Winter, Shawano, Wis. (Winter & Koehler, Shawano, Wis., on the brief), for appellees.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

The appellees, plaintiffs in the trial court, reside at the City of Tomahawk, Wisconsin,

where they are engaged in the business of manufacturing row boats, motor boats and skiffs. The appellant, defendant, is a Minnesota corporation. Its principal place of business is located in the City of St. Paul, Minnesota, where it is engaged in the business of drying lumber for others for compensation. Jurisdiction of the federal court is predicated upon diversity of citizenship and the amount involved, namely, a claim for damages in the sum of $7057.22.

The complaint alleged that in May, 1950, plaintiffs entered into a contract with the defendant by the terms of which they delivered on May 26, 1950, to defendant at its plant a carload of Western Cedar lumber which defendant agreed to dry to a 14% of moisture contents and to dry and process the lumber so that it would be suitable and fit for use in their business. It is then alleged that the defendant in the process of drying failed to exercise the ordinary care required for that purpose, and that by its negligence, carelessness and want of ordinary care the lumber was burned, charred and collapsed so that it was entirely worthless, to plaintiffs' damage in the amount of $7057.22.

So far as material on this appeal the defendant admits that it entered into a contract to kiln dry a carload of lumber for plaintiffs; and it alleged in its answer that it fully performed all the terms of the contract, and denied liability for any damages.

The case was tried to the court and jury, and a verdict was returned in favor of the plaintiffs for $6,700 upon which the judgment was entered from which this appeal was taken.

The defendant contends here that

1. The court erred in denying its separate motions:

(a) for a directed verdict at the close of plaintiffs' evidence; (b) for a directed verdict at the close of all the evidence; (c) for judgment notwithstanding the verdict;

2. In giving a certain instruction; and

3. In denying its motion for a new trial.

■ In considering these questions we must be governed by the substantive law of the state of Minnesota, where the contract was made and executed and where the court tried the case. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. But procedural questions are governed by the federal law applicable.

These contentions present in brief but two questions: (1) the sufficiency of the evidence to support a verdict and judgment for the plaintiffs, and (2) the objection to the court's instruction on the burden of proof.

■■ The first contention requires this court to review the evidence for the purpose of determining whether or not there was substantial evidence to go to the jury on the issues presented as a matter of law, or whether all reasonable men must reach the conclusion that there was not such evidence. "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury. And in determining a motion of either party for a peremptory instruction, the court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish, and that from such facts there should be drawn in favor of the latter all the inferences that fairly are deducible from them." Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Gulf, Mobile & Ohio R. Co. v. Williamson, 8 Cir., 191 F.2d 887; Stephenson v. Steinhauer, 8 Cir., 188 F.2d 432; Danaher v. United States, 8 Cir., 184 F.2d 673.

At its plant and place of business in St. Paul the defendant buys, stores and sells hardwood lumber. It has a complete planing mill and operates custom dry kilns where it dries lumber for other people. It has four modern dry kilns of the box or room type. Lumber to be dried is so placed in one of the large rooms that air heated to any desired temperature can be forced through the stack of lumber by large fans driven by electric power. Thermometers are located in the room to indicate both the temperature and the humidity of the air passing through. An operator is or should be in charge at all times to observe and regulate the temperature and the humidity.

A schedule for regulating the heat and humidity is adopted for drying each par-

ticular type of lumber to be dried, depending upon the kind of wood, such as oak, pine, cedar, etc., and the degree of dampness to be removed. Some woods may be dried in a few days whereas others may require a few weeks. Cedar and oak require longer treatment than most woods.

The carload of lumber involved in this controversy was purchased by the plaintiffs from Don B. Wallace on May 13, 1950. It consisted of 24,900 feet of green red cedar lumber shipped from the west coast. It was worth $215 a thousand feet. The frieght bill paid by plaintiffs was $1591.89. The car first stopped at the city of Tomahawk before it was kiln dried. The plaintiffs opened the car on both sides and examined the lumber and found that it was green and should be dried. The car of lumber was then sent to the defendant at St. Paul for drying. On May 17, 1950, Mr. Wallace wrote the defendant a letter saying, " * * * we want this car carefully and evenly dried to approximately 14% moisture content," with instructions to send it when dried to the plaintiffs at Tomahawk, Wisconsin. Upon arrival in St. Paul the defendant placed it in a drying kiln where it was kept for 22 days after which it was shipped back to the plaintiffs at Tomahawk. While in the kiln the atmosphere was kept at a temperature ranging from 115 up to 154 degrees.

Upon its return to Tomahawk the car was opened by plaintiff Winter who testified that he found it entirely worthless. He testified that "We picked out some of it that looked like it might be usable. We ran it through our mill room and it was so hard and brittle that when it came out of that machinery it fell apart. You would take it and attempt to bend it the life was gone. It just broke as it came out of the machine. We couldn't use it for anything." Three samples of the lumber were introduced in evidence. They were apparently worthless. Winter testified: "My opinion is the condition existing in these exhibits was caused by improper kiln drying. * * * It is just something that happened in the kiln." He further testified that "The exhibits are fairly representative of * * * 20,000 feet" of the lumber that came out of the car and that about 5,000 feet was damaged to a lesser degree. He was an experienced lumber man; he thought the damage was probably caused by the sudden application of heat; that he had been in the business 26 years and that he had never before seen anything like these exhibits.

Plaintiff Fred W. Dreger testified that he examined the lumber before it was sent to defendant to be dried and that there was no defect in it. He saw it again after it was returned to Tomahawk by the defendant and that it was not fit for use; that some boards looked a little better than the rest but when they attempted to use these boards they found them unfit for use; that they were warped and in an unusable condition due to change in structure. He further testified that plaintiffs had received about 25 cars of kiln dried Western Red Cedar but that outside of this shipment they had never received any kiln dried Western Red Cedar that resembled exhibits 1, 2 and 3.

Lawrence S. Clark, vice-president and secretary of the defendant, testified that "Lumber is composed of a series of cells. These are varying sizes, but when lumber is green the cell itself and the cell wall are both saturated with moisture and the problem is to remove the free water in the cell and also remove part of the water or moisture from the cell wall itself. In order to do that it is necessary to use * * * evaporation by keeping the surface of the board moist, the cell wall itself used as a wick to draw the free moisture out of the cell * * *."

In his testimony he also stated that he did not know when the collapse of the lumber occurred. He said, "My supervision wasn't close enough so I would know that. I don't know whether it was the first, second, or third day or toward the end when it occurred. The members of the Tomahawk Manufacturing Company exercised no control over the operation of the kiln and gave us no advice."

He further testified: "In doing custom work for compensation we hold ourselves

out as having the required amount of skill, judgment, discretion and ability to properly dry wood."

Mr. Clark also testified that they used standardized sets of kiln schedules, but tempered with good judgment; that standardized schedules cannot be used successfully otherwise because of the differences in the characteristics of the wood.

Raymond W. Burtman, an employee of the defendant, testified that he supervised and directed the piling and loading of the lumber in question which went into the kiln; that he was present and went into the kiln every day for the first nine days and observed the wood. He then went on vacation and did not know who observed and looked after the drying in his absence. Nor does the record disclose who supervised the work while Burtman was away. Whoever he was he was not called as a witness. Burtman returned for the last three days the lumber was in the kiln. He testified that the lumber was all right when it went into the kiln, except that it had a high degree of moisture content; that "we found none of the pieces collapsed at all * * * excessive heat usually causes collapse."

Burtman further testified: "We are supposed to take many samples of the lumber we put into the kiln in order to determine the moisture content. In this particular case we didn't take any—as a rule 10 or 12."

Louis W. Rees, an associate Professor in Forestry at the University of Minnesota, described the different types of "degrader" which may occur in drying wood. He testified that "One of the degrades would be checking; the cracking of lumber during the drying process. * * * Collapse is another type of degrade. Lumber that has collapsed is lumber in which there appears to be excessive shrinkage due to the collapse or pulling together of the cell walls during the drying process. * * * Another form of degrade is that there may be case hardening in kiln drying * * * hollow horning or pulling apart of the wood within the piece would be another type of degrade * * *."

The dry kilns used by the defendant at its plant were manufactured and furnished by the Moore Dry Kiln Company. Mr. Robert H. Knight, its sales and service manager, testified for the defendant, describing the operation of the process, and concluding with the statement that "I do know that all this western red cedar is being dried." He also testified that he knew of no other dry kiln more efficient in the drying of lumber than that in which defendant dried plaintiffs' lumber, and that "we try to get around to all of our kilns at least once every six weeks to see how they are being operated and how they are getting along."

In passing upon defendant's motion for judgment notwithstanding the verdict or for a new trial the court, after reviewing the evidence, held that "Drawing the most favorable inferences from this testimony it is apparent that defendant here was derelict in his duty of taking samples prior to beginning the dry kiln process to determine the proper starting temperature or to determine if it was possible to dry it at all, and if there was a risk involved, at least to inform the proper parties, or the interested parties, here the plaintiffs, thereof. It was testified that they have no records of such tests until well after the drying process was under way, and then only two tests are recorded. It is also noteworthy here that the man who was in charge of the kiln during the period that Burtman was on vacation was not called as a witness."

We have reviewed the record and we agree with the trial court that the evidence amply sustains the verdict of the jury.

Finally the defendant contends that the court erred in giving the following instruction:

"You are instructed that the burden of proof in this action rests upon plaintiffs to establish by a preponderance of the evidence their cause of action against the defendants. If the plaintiffs have shown from the evidence here that the lumber in question was delivered to the defendant in good condition * * * and that they owned the lumber and it was returned to them in such

a condition as would ordinarily not have occurred had the defendant used ordinary care, then plaintiffs have established what we in the law call a prima facie case, and the burden is then upon the defendant to show that it exercised a degree of care commensurate with the risk involved, that is to say, that degree of care which would be exercised by persons of ordinary prudence in the same or similar circumstances.

"In other words, if you find that plaintiffs have met their burden of showing that the lumber was returned in such a condition as ordinarily would not have occurred in the absence of negligence, and that defendant has failed to meet its burden of showing that it exercised that degree of care which you have determined is to be expected of it in the business in which it is engaged, then plaintiffs may recover. However, if you find that defendant has exercised that degree of care which you have determined it must exercise then your verdict must be for the defendant. If the damage or injury occurred through no fault of the defendant or solely because of the inherent nature of the lumber, the defendant cannot be held liable for it is not an insurer.

\* \* \* \* . \* \*

"\* \* \* And if upon any of the issues the testimony is evenly balanced, the decision upon such issues must be against the party upon whom rests the burden of proof \* \* \*."

The contentions that the evidence does not support the verdict and that the instruction quoted above is erroneous may be discussed together. The record is too clear upon these points to warrant a long discussion.

The defendant asserts that the instruction complained of is inconsistent with the law of Minnesota as stated by the Supreme Court of that state in Lebens v. Wolf, 138 Minn. 435, 165 N.W. 276, L.R.A.1918C, 868.

A comparison of the instruction with the law stated in that case discloses that the instruction is in strict harmony with the cited authority.

In its brief the defendant correctly says that the parties stand in the relation of bailee and bailor for their mutual benefit, the plaintiffs having caused green lumber to be delivered to the defendant for the purpose of having the lumber kiln dried to a specified moisture content by the terms of a written agreement, that is, by the directions given in a letter to defendant. The vice-president of defendant testified that "we hold ourselves out as having the required amount of skill, judgment, discretion and ability to properly dry wood."

The wood committed to defendant to be dried was green western cedar. It was moist. That was why plaintiffs wanted it kiln dried. Burtman testified that all lumber can be dried. He also testified that "we are supposed to take many samples of the lumber we put into the kiln in order to determine the moisture content. In this particular case we didn't take any." The purpose of taking tests was to give the necessary information in regard to the moisture content of the wood to enable defendant properly to regulate the heat to be applied. Instead of making tests to give them accurate information they chose to guess. The undisputed evidence shows that excessive heat is the factor which degrades and destroys the lumber when in the kilns. Further, the evidence shows that tests of moisture in the wood should be made not only before the lumber is placed in the kiln, but frequently thereafter. The evidence does not show that these precautions were taken. The jury would have been warranted in returning a verdict on the sole basis of negligence of the defendant in the operation of the kiln in such a way as negligently to overheat the lumber during all the time it was in the kiln.

Clearly the contentions of the defendant are without merit.

Affirmed.