NATIONAL POSTAL TRANSPORT
ASSOCIATION, Appellant,

v.

Dora HUDSON, Appellee.

No. 15035.

United States Court of Appeals
Eighth Circuit.

Oct. 27, 1954.

Rehearing Denied Nov. 22, 1954.

**194**

Charles B. Blackmar, Kansas City, Mo. (Roy P. Swanson, Richard G. Poland, and Blackmar, Newkirk, Eager, Swanson & Midgley, Kansas City, Mo., on the brief), for appellant.

A. C. Popham, Kansas City, Mo. (Wm. M. Thurman, Sam Mandell, and Popham, Thompson, Popham, Mandell, Trusty & Green, Kansas City, Mo., on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and COLLET, Circuit Judges.

THOMAS, Circuit Judge.

This is an appeal by the defendant in the trial court from a judgment for $4,000 and an attorney fee for $1,000. The action was brought by Dora Hudson upon a certificate, which provided for accidental death benefits, issued to her deceased husband Harold Hudson. The defense was suicide. The case was tried to a jury. The appellant's motions for a directed verdict and for judgment notwithstanding the verdict, or for a new trial, were overruled; and it appeals.

Jurisdiction is predicated upon diversity of citizenship.

Appellant is a fraternal benefit society organized under the laws of New Hampshire. Its membership is limited to employees in the railway postal service of the United States. Harold Hudson was 64 years old at the time of his death on March 2, 1952. The certificate on which this action is predicated was issued to him on March 31, 1914. It provided that in case of his death due to "external, violent and accidental means * . * * alone" the association would pay to his wife Dora Hudson $4,000. The complaint alleged that the insured did die as a result of an accident, and that, although due proof of such death had been furnished, defendant refused payment.

The answer admitted the issuance of the certificate but denied payment on the ground that "Harold Hudson died as the result of injuries inflicted upon himself * * *."

It was stipulated that the certificate in suit was applied for and delivered in the state of Kansas.

The undisputed evidence disclosed that the insured met his death from a gunshot wound in the chest, which was received while he was alone in an upstairs bedroom at his home in Kansas City, Missouri. It is conceded that in such a case there is a presumption that the cause of death was accidental rather than suicidal.

In seeking reversal appellant contends that:

1. The presumption that the death of Hudson was accidental was taken out of the case because appellant introduced substantial evidence of suicide and thereafter plaintiff failed to produce substantial evidence to support an affirmative finding of accidental death;

2. The court erred in excluding certain evidence offered by appellant; and

3. The court erred in allowing an attorney's fee to be taxed as costs.

The case was tried before a jury in October, 1953. Plaintiff identified the benefit certificate which was admitted in evidence without objection. She testified that in August, 1951, Mr. Hudson had an operation for a prostate condition at which time he was in the hospital six days or so; that he recovered from the operation and that on March 2, 1952, the state of his health and his general appearance were good. After the operation he made one road trip in November, 1951, and that he did not work after that.

She was familiar with his retirement program and had discussed it with him.

March 2, 1952, the day of his death, was a Sunday. Mr. Hudson arose that morning about 8 o'clock. He had breakfast and read the paper. He seemed to enjoy his breakfast after which he worked around the house. Bob Walters, her grandson, was coming over for dinner, as he often did. He arrived about half past eleven, and he and Mr. Hudson sat in the living room visiting and talking over the events of the day. Mr. Hudson seemed perfectly normal.

They had dinner about one o'clock to one-thirty. Mr. Hudson enjoyed it and ate normally. After dinner she started to clear the table, and Bob and Mr. Hudson went into the front room and visited. They arranged to go to a show from about 5:30 to 6:00 p.m.

Next Mr. Hudson walked through the dining room and went upstairs. As he passed, he said to her, "I am going upstairs to finish cleaning my gun."

About 15 minutes after he had gone upstairs, she heard an odd noise and went up and found him lying on the floor. The room was large and it was furnished with two beds. The heads of the beds were to the west and there were six or seven feet between them. He was between the beds lying on his face. He did not answer when she called to him. Bob then came up and covered him with a blanket. In response to a call by Bob some doctors came and took him to a hospital. She followed with Bob in his car. She found her husband in the emergency ward and tried to talk to him, but he did not recognize her. He never answered her nor showed that he heard her speaking. He was then removed to the operating room where the doctors operated on him, and he died that evening about 6:45. She afterwards found a bullet on the floor of the upstairs room and saw a mark on the head of the bed.

She did not see the gun on the floor when she first went upstairs; but she saw it afterwards on a little table where Bob had put it.

She testified further that Mr. Hudson was known as "Hap" to his fellow workers because of his pleasant disposition. Their home was free and clear and he was not involved in heavy debts or financial matters. He talked of his retirement and the $250 a month which he would get.

Robert Walters, a grandson of plaintiff, testified that he was 28 years old, and that he was at the Hudson home for dinner on March 2, 1952. His account of the dinner was substantially the same as that of Mrs. Hudson. When dinner was over he and Mr. Hudson went into

the living room and continued discussing the events of the past week. Mr. Hudson was interested in passing events and sports.

After dinner Mr. Hudson went upstairs. Within a few minutes he heard an unusual noise. Mrs. Hudson went upstairs, and he heard her call "Harold." He then went upstairs himself and found Mr. Hudson lying face down on the floor between the two beds. He threw a blanket over him. Various doctors and police officers came, and Mr. Hudson was taken to the hospital. The witness followed to the hospital, and upon his arrival he found Mr. Hudson in the emergency room. He did not hear Hudson make any statement, and he thought that at all times Hudson was unconscious.

On cross he testified that he did not look for wounds on Mr. Hudson; he saw no movement; he was lying face down; the gun was on the west side of the body, on Mr. Hudson's right. He picked the gun up and put it on a small table nearby.

On redirect he testified that he was a combat infantryman in the Army and that the gun which Mr. Hudson had had no safety on it. He did not examine the gun, and he was not familiar with the safety lock on the inside of a Colt revolver.

Willard Walters, a brother of Robert Walters, testified that he went to the hospital, arriving there as they were taking Mr. Hudson from the emergency room to surgery. At that time he appeared to be unconscious and unable to communicate with anyone.

Thomas E. Paden, a witness for appellant, testified that he was the postal transportation clerk and Division President of appellant. He identified its Charter and Constitution. He talked with Mr. Hudson about two weeks before his death. Hudson inquired whether, if he died before going on retirement, his wife would be eligible for survivor annuity. In answer to Paden's inquiry, he said he was not feeling very well.

Leon Landreth, called as a witness by appellant, testified that he is clerk for appellant; that he talked with Hudson, probably a month before his death. At that time Hudson had not decided whether he would return to work or not. He testified further that postal clerks are required to carry revolvers, known as Banker's Special Colt revolvers, which were furnished by the Government. At the time of Hudson's death his salary was approximately $5,100 per year.

On cross he testified that Hudson was enthusiastic about baseball and sports. He seemed to enjoy life; he had a good disposition, and his nickname was "Hap."

Counsel for appellant summarized the evidence relied upon for reversal in brief as follows:

The gun found beside Hudson was one which he was required to have in the performance of his duties as a railway postal clerk. He ordinarily kept it downstairs, but he had been cleaning it upstairs on Saturday, March 1st, and left it on top of a dresser. Although a search was made for cleaning material after the shooting, none was found upstairs. No live ammunition was found upstairs after the shooting, and one expended shell was found in the gun.

The entrance wound was a circular one about two inches below the left nipple. There were powder burns around the point of entry. The bullet ranged somewhat downward through the body leaving an exit wound to the left of the spine and about two inches lower than the point of entry.

While Hudson was in the emergency room at the hospital Detectives Johnston and Roberts were permitted by Dr. Drake, the attending physician, to speak to him. Johnston testified that "At this time they [Johnston and Roberts] were standing approximately three or four feet away from where Mr. Hudson was lying and evidently he overheard the conversation and voluntarily made the remark, 'No one is to blame; I shot myself.'" They started to ask him why and before they could actually ask him, he said, "I'm sick and tired of living."

There was no evidence of any other or further conversation or statement by Hudson while he lived.

The gun was examined by a ballistics technician and found to be in good working order. The cartridge case showed marks indicating that it had been struck by the firing pin at least three times. This could be accomplished only by pulling the trigger at least 15 times, so that the shell would come under the hammer three times, or by breaking the cylinder after pulling the trigger and rotating it backward twice. The normal method of cleaning a gun such as this one is to swing the cylinder out and run a swab through the barrel. In this position the gun cannot be fired. There is a safety lock in the gun which prevents firing while the hammer is forward.

In rebuttal the appellee Mrs. Hudson denied that she told police officers that Hudson had been despondent because he could not work or that she was afraid that he shot himself.

The jury returned a verdict for plaintiff, and defendant's motions for judgment or for a new trial were overruled.

After judgment plaintiff moved for allowance of an attorney's fee to be taxed as costs, pursuant to § 40–256 of the General Statutes of Kansas; and an allowance of $1,000 was granted over the objection of appellant.

The primary contention of appellant is that the court erred in overruling its motion for a directed verdict or for a new trial. The point urged here is that the presumption that Hudson's death was accidental was taken out of the case by the testimony of the two police detectives, Johnston and Roberts, set out above. This and other disputed testimony, it is claimed, entitled appellant to a directed verdict.

■ Before considering the errors which appellant asserts require reversal, the rule must be applied here that the evidence and all reasonable inferences to be drawn therefrom must be considered in the light most favorable to the prevailing party, in this instance the plaintiff. Rennicke v. United States, 8 Cir., 207 F.2d 429; Waylander-Peterson Co. v. Great Northern Ry. Co., 8 Cir., 201 F.2d 408; Empire District Electric Co. v. Rupert, 8 Cir., 199 F.2d 941; St. Paul Hotel Co. v. Lohm, 8 Cir., 196 F.2d 233; Capital Transit Co. v. Bingman, D.C.Cir., 212 F.2d 241.

■ Nor must we overlook the well-settled principle applicable in cases on appeal: "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury." Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 233, 74 L.Ed. 720; Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Stephenson v. Steinhauer, 8 Cir., 188 F.2d 432; Twin City Hardwood Lumber Co. v. Dreger, 8 Cir., 199 F.2d 197; Willits v. Yellow Cab Co., 7 Cir., 214 F.2d 612, 615.

■ And we cannot forget that " 'A jury does not have the power to render a capricious and arbitrary verdict in total disregard of the evidence.' " Wetherbee v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 191 F.2d 302, 310; Empire District Electric Co. v. Rupert, supra.

■■ It is a fact and a part of common knowledge that all normal human beings love life and shrink from death. Appellant overlooks the fact that many accidental deaths are self-inflicted, and that a person may shoot himself accidentally and wholly unintentionally. So here the presumption was against Hudson's intentionally committing suicide by shooting himself with the gun he had in his possession as a railway mail clerk.

However, the Supreme Court of Missouri has succinctly stated in Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W. 2d 136, 140, that "When substantial evidence is introduced by the party against whom a presumption operates controverting the presumed fact, then its existence or nonexistence is to be determined from the evidence, exactly as if no presumption had ever been operative in the case." And see O'Brien v. Equitable Life Assurance Soc. of the U. S., 8 Cir., 212 F.2d 383, 386; Mackowik v. Kansas

City, St. Joseph & C. B. R. Co., 196 Mo. 550, 94 S.W. 256, 262.

In Home Insurance Company v. Weide, 11 Wall. 438, 78 U.S. 438, 440, 20 L.Ed. 197, the Supreme Court said: "It is well settled that if the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury. It would be a narrow rule, and not conducive to the ends of justice, to exclude it on the ground that it did not afford full proof of the non-existence of the disputed fact. Besides, presumptive evidence proceeds on the theory that the jury can infer the existence of a fact from a fact that is proved, and most usually accompanies it * * *."

It is undisputed that Hudson met his death by a self-inflicted gunshot wound. Because of the love of life innate in all human beings it is presumed that his death was the result of the gunshot wound accidentally inflicted. Appellant insists that the testimony of detectives Johnston and Roberts that Hudson's statements that "Nobody is to blame. I did it myself" and "I am sick and tired of living" dissipated the presumption and that appellant was entitled to a directed verdict unless plaintiff produced substantial evidence to support the finding of accidental death, which it denies.

■ Plaintiff's evidence tends to show that there was no reason for Hudson to end his life deliberately. It is true that he had been ill, and while he had not worked since the previous November, he was drawing full pay on accumulated leave. There were no difficulties at home; no financial worries; he was looking forward to retirement when he was to draw $250 a month. Those who worked with him testified to his pleasant and sunny disposition and that his nickname was "Hap." Nothing occurred on the day of the accident to indicate that he had any intention of taking his own life. He and Bob Walters had talked on the events of the past week, sports in which he was greatly interested, and arrangements had been made to go to a movie later in the afternoon. Against this un-contradicted evidence is presented the testimony of two police detectives, Johnston and Roberts, which is not conclusive. Hudson's alleged statement that "Nobody is to blame. I did it myself" is as consistent with an accident as it is with deliberate intention. The further alleged statement, "I am sick and tired of living" is, as the court instructed the jury, more serious and capable of being construed as indicating suicide. However, it was only a circumstance for the jury to consider in connection with all the evidence. The fact that the testimony of detectives Johnston and Roberts is not expressly contradicted does not mean that the trier of the facts must accept it as true. Railway Mail Ass'n v. Chamberlin, 8 Cir., 148 F.2d 206; Doering v. Buechler, 8 Cir., 146 F.2d 784, 787; Elzig v. Gudwangen, 8 Cir., 91 F. 2d 434, 440–444. See, also, Edwards v. Business Men's Assurance Company, 350 Mo. 666, 168 S.W.2d 82. But even if true, the alleged statement of Hudson that "I did it myself * * * I am sick and tired of living" may have been explained to the satisfaction of the jury by the undisputed fact that Hudson was at the time suffering great pain. See the last cited case for an analogous situation.

■ In this case there is no evidence in the record showing how the fatal shot that killed Hudson came to be fired. The circumstantial evidence discussed at length in the briefs presented questions only for the consideration of the jury. No useful purpose could be served by discussing such evidence in this opinion. See Pacific Mutual Life Insurance Company of California v. Brooks, 8 Cir., 14 F.2d 307, and Edwards v. Business Men's Assurance Company, supra [350 Mo. 666, 168 S.W.2d 89]. Under Missouri law "'It is well settled * * * that, where the evidence is wholly circumstantial, suicide cannot be declared, * * * as a matter of law, unless such circumstances exclude every reasonable hypothesis except suicide.'" See Edwards v. Business Men's Assurance Company, supra. And see, also, 45 C.J.S.,

Insurance, § 773, p. 803. And, although the presumption against suicide "* * * was gone, there remained, of course, the biological fact that all normal human beings love life, and shrink from death. The recognition of the existence of this fact is a part of common knowledge." Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S.W. 1043, 1048. And in Parker v. Aetna Life Insurance Co., 289 Mo. 42, 232 S.W. 708, 716, the Supreme Court of Missouri said: "* * * it would be entirely proper * * * for the jury to consider in reaching their verdict, that the love of life is the strongest instinct of a human being, and no man ought to be presumed to commit suicide, not, however, as a matter or presumption of law, but as a matter and presumption of fact of such probative force as the facts and circumstances in the particular case would justify and warrant in the opinion of the jury. When the facts and circumstances appear, the presumption against suicide, as a presumption of law, disappears, but as a presumption of fact it is and must be ever-present with all reasonable men whose duty it is to pass on the ultimate fact of suicide or accident, where the evidence is all circumstantial." See, also, Gilpin v. Aetna Life Insurance Co., 234 Mo.App. 566, 132 S.W.2d 686, 693.

■ Upon the record here, applying the law of Missouri as shown by the decisions of its courts, the trial court did not err in submitting the case to the jury for it to determine whether, considering all the circumstances in evidence, the death of Hudson was accidental or suicidal.

The appellant contends further that the court erred in refusing to permit it to rehabilitate Officer Johnston by showing prior statements consistent with his testimony on trial after appellee had sought to impeach him.

This contention refers to the record wherein Johnston testified that while on March 2, 1952, he and Officer Roberts were talking in the presence of Mr. Hudson in the emergency room in St. Joseph's Hospital he heard Hudson say: "No one is to blame; I shot myself." "I am sick and tired of living."

William Thurman testified for plaintiff in rebuttal that he was one of the attorneys for Mrs. Hudson and that he had been a member of the Missouri bar since 1928; that he went to the home of Officer Johnston to talk about the matter and that Johnston said that all he knew about the matter was that they wanted to find out whether there was any third party involved or present and that all he knew "was that Hudson was asked out at the hospital and the man said 'No, I did it myself.'" That Johnston made that statement on at least two different occasions.

Thereupon counsel for appellant, for the purpose of showing that prior statements of Johnston were consistent with his testimony, offered in evidence Exhibit C-11, described as a Report of the Police Department, identified by Johnston, to which counsel for appellee objected on the ground that it was incompetent and not binding upon plaintiff. The objection was sustained.

The pertinent statement in the Report, which is copied in the record, reads: "We [Johnston and Roberts] then went to St. Joseph's Hospital where we found the victim [Hudson] in the emergency room being treated by Dr. Drake who told us that the victim was in a very serious condition. While we were talking to the doctor, *Mr. Hudson told us that he shot himself in an attempt to commit suicide.*" Italics supplied.

■ It will be noted that this statement in the officers' report which was offered in evidence is not the same as their testimony at the trial. It is an attempt to enlarge and interpret that testimony. It is not in any true sense an attempt to rehabilitate the witness. The question whether the revolver was discharged accidentally or intentionally was for the jury to determine from all the circumstances in evidence, and not for the witness.

■ The general rule applicable in the situation here, as well as its excep-

tions, was discussed at length by Judge Sanborn, speaking for this court, in Affronti v. United States, 8 Cir., 145 F.2d 3, 7. It is there said, at page 7, that "The general rule is that when the testimony of a witness has been impeached by evidence of his prior inconsistent statements, his testimony ordinarily may not be confirmed by proof of his prior consistent statements." Exceptions to the rule are then stated, but they are not applicable here. And the court concluded that "* * * the question of the admission or rejection of evidence of prior consistent statements to sustain the credibility of a witness who has been impeached by evidence of prior inconsistent statements is addressed to the sound discretion of the trial court, and that its ruling should not result in a reversal on appeal except where there has been a prejudicial abuse of discretion", citing Wigmore on Evidence, 3d Ed., Vol. IV, § 1126, page 199.

The question presented here was discussed at length by the St. Louis Court of Appeals in Williams v. St. Louis Public Service Co., Mo.App., 245 S.W.2d 659, 664, where it is said: "At the present time the courts of all jurisdictions are unanimous in holding that proof of statements made by a witness out of court, similar to and in harmony with his testimony, are, as a general rule, inadmissible."

The court did not abuse his discretion in the ruling complained of here.

Finally appellant contends that the court erred in approving the allowance of a $1,000 attorney's fee to be taxed as costs in favor of appellee. In support of this contention two points are urged:

(a) The Kansas statute providing for the allowance of such fees applies only to insurance companies and mutual assessment associations and not to fraternal benefit societies; and

(b) Since the Kansas statute in question was passed after the issuance of the certificate here in suit its enforcement would constitute an impairment of the obligation of contracts and a deprivation

of due process of law in violation of the Constitution of the United States.

The home office of appellant is located in Portsmouth, New Hampshire. The beneficiary certificate involved here was issued to Harold Hudson on March 31, 1914, and delivered to him in the state of Kansas where he resided at that time. It was stipulated at the trial that the "Certificate" is a Kansas contract. It must, therefore, be construed by the laws of that state, Employers' Liability Assurance Corporation, Ltd., v. Youghiogheny & Ohio Coal Company, 8 Cir., 214 F.2d 418; and, in diversity of citizenship cases, such as this is, the question of conflict of laws must follow the rules prevailing in the state where the court sits, in this case the state of Missouri. Klaxon Company v. Stenter Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

Section 40–256 of the Revised Statutes of Kansas reads:

"Attorney's fees in actions of health and accident policies. That in all actions hereafter commenced, in which judgment is rendered against any insurance company or mutual assessment association on any policy of health or accident insurance, if it appear from the evidence that such company or mutual assessment association has refused to pay such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs * * *."

Section 40–201 of the General Statutes of 1949 provides that the term "insurance company" applies "to all corporations, companies, associations, societies, persons or partnerships writing contracts of insurance, indemnity or suretyship upon any type of risk or loss: Provided, however, That this definition shall not be held to include fraternal benefit societies as defined in section 40–701 of this code * * *."

Section 40–701 defines a fraternal benefit society as: "* * * a corpora-

tion, society or voluntary association of individuals, formed or organized into a lodge system with ritualistic form of work, and shall be carried on for the sole benefit of its members and their beneficiaries, and not for profit."

Appellee contends that appellant is a mutual assessment association within the meaning of the Kansas statutes, and that the allowance of an attorney's fee is accordingly right and proper. Referring to mutual assessment associations, section 40–1401 of the General Statutes of Kansas, 1949, reads: "Such associations shall reserve in their by-laws and articles of incorporation the right to collect additional assessments so that the liability of members shall not be limited to fixed premiums."

No decision of the Supreme Court of the state of Kansas construing the foregoing statutes and distinguishing a "mutual assessment association" from a "fraternal benefit society" as defined in § 40–701 of the Code of Kansas, supra, has been cited by either party. If appellant is merely a "mutual assessment association", the judgment for an attorney's fee is proper and must be affirmed. On the other hand, if the definition of a "fraternal benefit society" is more clearly definitive of the type of insurance involved in the certificate, appellant is not liable for an attorney's fee.

A careful consideration of the statutes and of the whole record persuades us that appellant is clearly a "fraternal benefit society" within the meaning of the statute. It is a "voluntary association of individuals"; it is "organized into a lodge system with ritualistic form of work"; and it is carried on for the "sole benefit of its members and their beneficiaries and not for profit."

It thus appears that appellant has all of the characteristics of a "fraternal benefit society" within the meaning of the statute of Kansas, as well as some of the characteristics of a mutual assessment association.

Appellee contends further that appellant is not a fraternal benefit organization as generally understood and as such intended to be exempted from the operation of the General Insurance Statutes of Kansas, because nothing in the record indicates that appellant is a lodge society with ritualistic form of work. This argument does not appear tenable, however, because the Charter, Constitution and Ritual of the appellant introduced in evidence show that it is subdivided into branches and a ritual is prescribed for the conduct of their meetings and the initiation of members.

In her complaint appellee asked for the allowance of an attorney's fee. In its answer appellant denied her right to such fee. Appellant argues here that since the Kansas statute allowing attorney's fees in suits upon insurance policies was passed after the issuance of the certificate in suit, its enforcement would constitute an impairment of the obligation of contracts and a deprivation of due process of law in violation of the Constitution of the United States. In view of the conclusion we have reached above, it is unnecessary to enter upon a discussion of this point.

For the foregoing reasons the judgment for $4,000 with interest and costs is affirmed, and the order allowing an attorney fee of $1,000 as a part of the costs is reversed.