298 F.2d 928
 Wayne SCOTT and Kevin Scott, infants, by Lauretta Scott, their guardian ad litem, and Lauretta Scott, individually, and John T. Scott, Plaintiffs-Appellees,
v.
SPANJER BROS., INC., and August Drexler, Defendants-Appellants.
 No. 88.
 Docket 27056.
 United States Court of Appeals Second Circuit.
 Argued November 28, 1961.
 Decided January 11, 1962.
 
 John G. Reilly, New York City (Reilly & Reilly and Peter E. DeBlasio, New York City, on the brief), for appellants.
 Raphael H. Weissman, Brooklyn, N. Y. (Laurence Feldman and Marvin Hochberg, New York City, on the brief), for appellees.
 Before CLARK, HINCKS and KAUFMAN, Circuit Judges.
 KAUFMAN, Circuit Judge.
 
 
 1
 This appeal is taken from a judgment in favor of plaintiffs-appellees[1] in an action brought to recover damages for personal injuries sustained through the alleged negligence of the defendants-appellants. The case was tried before Judge Bartels and a jury.[2]
 
 
 2
 Appellants, upon several grounds, contend that the appointment of a medical expert to examine and testify on the condition of the infant-plaintiff, Wayne Scott, was erroneous and prejudicial. It is appellants' contention that the testimony of the court-appointed expert led to an excessive verdict for Wayne, and also caused higher verdicts for the other plaintiffs. We believe that no error was committed in the appointment of the expert or in the admission of his testimony, and therefore we affirm the judgments entered below.
 
 
 3
 The action involved in this appeal stems from an accident in which Lauretta Scott and her two children, Wayne and Kevin, who were in a baby carriage, were hit by a truck owned by appellant Spanjer Brothers, and operated by appellant Drexler, an employee of Spanjer Brothers. The impact knocked Lauretta to the ground and threw Wayne out of the carriage; Kevin remained in the carriage which was pinned under the truck. The mother and children were subsequently taken to a hospital, where Wayne, with whom we are presently concerned, was treated for abrasions of the scalp. Thereafter Wayne came under the care of the family physician, Dr. Rothenberger, who treated him for various bruises. Since the accident, and as a result of it, Wayne has not been able to sleep well, has developed anxieties, and has suffered from headaches.
 
 
 4
 Inasmuch as the principal error assigned concerns itself with the appointment of Dr. Lawrence Kaplan as the Court's expert witness, some background discussion is in order. On March 27, 1961, the case was marked "ready" on the court calendar and assigned to Judge Bartels for trial. That afternoon, the trial judge notified counsel for both sides that since an infant (Wayne) was involved in the action, he believed that he had a "duty" to "protect" the infant's rights, and therefore he intended to appoint an impartial neuro-psychiatrist to examine that plaintiff[3] "for the purpose of ascertaining the extent of his injuries in order that the jury might know whether those injuries were permanent" (Tr. p. 5). It is clear that the judge first instructed the parties themselves to select an expert of their own choice. They in fact attempted to secure the services of either a Dr. Wexler, a Dr. Reilly, or a Dr. Echlin, all of whom were members of the approved New York Medical Panel.[4] Apparently none of these men was available to serve with the degree of promptness dictated by the circumstances. As a result, Judge Bartels indicated that he would appoint ex mero motu Dr. Lawrence Kaplan, who was described by appellants' counsel as having "terrific qualifications" (Tr. p. 8) to examine the infant Wayne and submit a report. Appellants raised various objections to the appointment of Dr. Kaplan. The judge sought to accommodate them by offering to appoint Dr. Wexler, if he would be available promptly, despite the fact that this would entail holding a late trial session so that the doctor could testify. However, the appellants were unsucccessful in their efforts to gain the services of Dr. Wexler, and the trial proceeded with the understanding that Dr. Kaplan would serve.
 
 I.
 
 5
 Appellate courts no longer question the inherent power of a trial court to appoint an expert under proper circumstances, to aid it in the just disposition of a case. Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920); 9 Wigmore, Evidence § 2484, p. 270 (3rd ed. 1940). McCormick points out that: "[c]ases are recorded as early as the 14th Century — before witnesses were heard by juries — of the summoning of experts by the judges to aid them in the determining of scientific issues. The existence of the judge's power to call witnesses generally and expert witnesses particularly seems fairly well recognized in this country." McCormick, Some Observations Upon the Opinion Rule and Expert Testimony, 23 Texas L.Rev. 109, 131 (1945); see also, Rule 28, Fed.R.Crim.P., 18 U.S.C. "The appointment of disinterested expert witnesses by the Court is one of the expedients employed for reforming the defects of the partisan system of providing * * * testimony." 9 Wigmore, Evidence, supra; see also, 2 Wigmore, Evidence § 563, n. 7 (3rd ed. 1940), which sets forth statutes in various jurisdictions establishing procedures for the use of expert witnesses by the courts.
 
 
 6
 We believe that the appointment of an impartial medical expert by the court in the exercise of its sound discretion is an equitable and forward-looking technique for promoting the fair trial of a lawsuit. It is now well accepted that the trial judge is not a mere umpire at the trial; indeed, there may be circumstances in which he would have a duty to seek impartial assistance in order to enlighten the jury and himself on issues which have become confused because of partisanship in presentation. In the instant case the judge was confronted with a young infant plaintiff who might have suffered injuries of a serious nature which were difficult to diagnose and explain. We believe that he exercised sound judgment.
 
 II.
 
 7
 The appellants urge that the employment of the expert shortly before the trial and in the absence of any notice from Judge Bartels at a pre-trial conference held several months earlier that he was going to follow this procedure, constituted prejudicial error. If we were able to find that substantial prejudice resulted to the appellants from this action of the trial judge, we would agree that there would be merit to this contention; but, we do not find that this is the case.
 
 
 8
 Appellants overlook the explicit language of Rule 16 of the Federal Rules of Civil Procedure, 28 U.S.C., and the philosophy underlying that rule. Rule 16 provides that a pre-trial order "when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."[5] (Emphasis supplied.) The trial judge clearly has the authority to amend or modify a pre-trial order if this becomes necessary in the interest of justice. Nims, Pre-Trial, p. 159 (1950). To hold otherwise would make a strait-jacket out of a procedural reform which was intended to provide a useful device in the court's search for truth. Indeed, some of the critics of pre-trial have claimed that it tends to make the proceedings too rigid and inflexible. While it is true that courts quite properly have been reluctant to allow modification of pre-trial orders where this would work an injustice, see Fernandez v. United Fruit Co., 200 F.2d 414 (2d Cir. 1952); Washington v. General Motors Acceptance Corp., 19 F.R.D. 370 (S.D.Fla.1956), it should be recognized that an unswerving insistence upon every provision of a pre-trial order, under certain circumstances, may cause injustice.
 
 
 9
 Addressing ourselves to the alleged untimeliness of the appointment we note that the appellants did not object to the selection of Dr. Wexler. We fail to see how their complaint of lateness has any persuasiveness when it appears that it was raised only after Dr. Kaplan was substituted for Dr. Wexler. Furthermore, any claim of surprise which appellants press with regard to the doctor's testimony lacks substance. A representative of the office of appellants' counsel was present when the infant, Wayne, was examined by Dr. Kaplan (Tr. p. 206). In addition, the "history" testimony given by Dr. Rothenberger upon which Dr. Kaplan based his opinion was in evidence before Dr. Kaplan testified.
 
 III.
 
 10
 It is also urged on this appeal that Dr. Kaplan was biased because he allegedly had a great deal of experience as a "plaintiff's doctor." Assuming that this were so, it would not ipso facto support an inference that the doctor would not give an honest opinion in the present case. Moreover, we have made a careful study of the doctor's testimony, and find that it was open and fair.[6] The issue really resolves itself to one of credibility. The appellants had an opportunity to cross-examine the doctor and to develop any claim of bias; but, the record indicates that while Dr. Kaplan was examined carefully on the medical aspects of the case, appellants chose not to ask a single question concerning the doctor's alleged bias.[7] Under these circumstances they cannot complain that the jury, whose province it was to determine credibility, may have believed his testimony.
 
 IV.
 
 11
 Appellants seek furthermore to have this Court review the award of damages for excessiveness. In the present case it appears that while the medical expenses were minimal, the verdicts were unquestionably based upon the pain and suffering sustained by the plaintiffs. There is no adequate reason for modification.
 
 
 12
 Finally, appellants submit that little weight should have been given to the testimony of Dr. Rothenberger. Our short answer to this is that the law is clear that credibility is a question for the trier of fact and in a case such as this, not one upon which this court will pass. Ellis v. Union Pacific R. Co., 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947) (jury); Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720 (1930) (jury); Nat. Postal Transport Ass'n v. Hudson, 216 F.2d 193, 197 (8th Cir. 1954) (jury); Oil Transport Corp. v. Amboy Towboats, Inc., 193 F.2d 264, 265-266 (2d Cir. 1952) (non-jury).
 
 
 13
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 
 Lauretta Scott (mother) ............... $ 5,000.
 Wayne Scott (infant) .................. 15,000.
 Kevin Scott (infant) .................. 1,500.
 John Scott (father) ................... 2,500. (Loss of consortium)
 Baby carriage ......................... 50.
 _______
 Total ................... $24,050.
 
 
 [2]
 The action was originally brought in the Supreme Court of the State of New York, Kings County, but was removed to the United States District Court for the Eastern District of New York on the basis of diversity of citizenship jurisdiction, 28 U.S.C. § 1332, plaintiffs being residents of New York and defendants residents of New Jersey
 
 
 [3]
 Although there were two children involved in the accident, the judge appointed a doctor to examine Wayne only because he seemed to be the more seriously injured of the two. Wayne was 3½ years old at the time of the accident, and was 5 years old when the case was tried
 
 
 [4]
 There is no indication in the record that appellants objected to having any one of these men appear as an expert
 
 
 [5]
 The order entered by Judge Bartels provided that modifications "may be had either on the application of counsel for the parties or on motion of the Court." Record, p. 575
 
 
 [6]
 The doctor was permitted to present his testimony in narrative form, with each party given an opportunity to examine him. He testified about his examination of the child, and stated that the infant had developed a "terror reaction." He admitted that his opinion was based primarily on the history as given to him. Thus, the jury was free to disregard the validity of the history and the doctor's conclusions based on it; apparently they did not. The doctor also testified that the condition "should not be permanent" (Tr. p. 251); clearly this was not unfavorable to the appellants
 
 
 [7]
 Judge Bartels asked the doctor whether he had testified before, and if he had, whether for plaintiffs and/or defendants. By doing so the door was opened for appellants' counsel to probe into any bias the doctor might have towards defendants in civil actions, but this was not done
 
 
 
 14
 HINCKS, Circuit Judge (dissenting in part).
 
 
 15
 I dissent from so much of the opinion as holds that the trial judge acted without error in appointing at the very outset of the trial a physician of his own choice to examine the plaintiff Wayne Scott out of court and to testify to his findings, conclusions and prognosis at the trial without any prior report thereof to the parties.
 
 
 16
 My brothers say that "the appointment of an impartial medical expert by the court * * * is an equitable and forward-looking technique for promoting the fair trial of a lawsuit." I agree that this is so when the appointment is safeguarded to insure the impartiality of the expert and to protect the parties from surprise. But that was not done here.
 
 
 17
 The desirability of the selection of unbiased experts by the judge is discussed by Wigmore in § 563 of his treatise. The preferred procedure is outlined in ¶ (3) (C) of that section (3rd ed., Vol. II, p. 648). There Wigmore accepts as "the final solution" of the underlying problem the model uniform Act proposed in 1937 by the National Conference of Commissioners on Uniform State Laws after years of debate and study. Perusal of the Act which is set forth in § 563 (Vol. II, p. 651 et seq.) will show numerous vital safeguards provided by the Act not taken by the court below.
 
 
 18
 Thus §§ 2 and 4 of the model Act require that before making an appointment the judge shall give reasonable notice to the parties of the names of the experts proposed for appointment and shall appoint the experts agreed on by the parties. Here the notice on the very eve of trial was far less than reasonable: it was so short that an expert on whom the parties apparently could have agreed could not be obtained in time — an obstacle which could have been avoided by but a few days' notice. The unreasonableness of notice on the eve of trial is further pointed up by the fact that at pre-trial three months earlier the trial judge had indicated no intention of himself appointing an expert or any need therefor. Yet the only reason given for an appointment at the eve of trial was that because the plaintiff Wayne was an infant the "Court has the very important duty to protect an infant's rights" and "wanted to appoint a doctor to examine that infant as of today for the purpose of ascertaining the extent of his injuries, etc." One may question whether a court is under a duty to appoint expert witnesses for infant plaintiffs represented by counsel. But even so, the duty could have been as well discharged under a more seasonable notice which would have given time for the parties to agree on an expert.
 
 
 19
 Section 6 of the model Act makes provision for written reports by the court's experts to be filed and open to inspection by any party and later to be read by the witness in court. Here, appellants' counsel was not advised of what the expert would say until he actually testified. This was after counsel had completed his cross-examination of Wayne's mother on whose version of Wayne's "history" the expert's testimony was solely based. And of course at that stage it was too late to consult and perhaps call other psychiatrists.
 
 
 20
 Section 10 of the model Act provides that the compensation of the court's expert, as approved by the court, may eventually be taxed as costs against the losing party. In the absence of enabling legislation or of provision for compensation by agreement between the parties, there is no authority for compelling a party to compensate the court's expert. The party who calls an expert is generally the only available source of his compensation, except of course for the insignificant per diem of $4 allowed under 28 U.S.C.A. § 1821 and taxable under 28 U.S.C.A. § 1920. I think it would be a clear abuse of discretion for a judge to order a professional man, medical or engineering, to go to the labor of examining a patient or other subject-matter out of court and then testify as to his expert opinion without provision for compensation more nearly adequate than the meagre fee provided by 28 U.S.C.A. § 1821. Indeed, it would be unfair to expect physicians and scientists to serve as experts on that basis in cases in which the lawyers presumably have retainers carrying adequate compensation. Without adequate authorized compensation for court-appointed experts there is danger of some sub rosa arrangement for compensation by a party — a situation under which the court's expert in fact would be no more unbiased than one called by a party.
 
 
 21
 It is true that the model Act above discussed has not been widely adopted — only in South Dakota and Vermont so far as my researches show. But the failure of an Act such as this with all its restrictive safeguards to achieve enactment, is scant reason for judges, at least in run-of-the-mill cases such as this, to arrogate to themselves unrestricted powers which under traditional trial procedure are reserved to counsel.
 
 
 22
 Any consideration of the desirability of court-appointed experts should not overlook the fact that in the medical field, as well as in other sciences, there are many areas in which the experts are divided into opposing schools of thought. Under the conventional trial technique, the opposing parties will each generally proffer experts favorable to his position thus leaving it to the trier to decide, with such aid as cross and redirect examination may afford, which view rests upon the more reliable base — a difficult task especially for a jury. On the other hand, a judge making an a priori appointment often unaware of the existence of opposing schools in the area may inadvertently appoint an expert who, by his professional and personal attitudes, is precommitted to a particular school and his views, with the accolade flowing from a judicial appointment, may well be decisive. Thus the outcome of unilateral judicial appointment may be not so much an improvement of justice as the fortuitous product of arbitrary — albeit well-intended — judicial action.
 
 
 23
 The procedure adopted here did not comply with that prescribed for criminal cases by Fed.Rules Crim.Proc. rule 28. It was in violation of the spirit of Fed.Rules Civ.Proc. rule 38(b). Surely a party needs protection from surprise caused by a judge as much as that caused by his adversary. And I cannot understand my brothers' reliance on Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919, which involved the power of a judge to appoint an auditor whose task it was to organize and report on independent evidence — not to contribute new evidence as does a witness.
 
 
 24
 I would reverse the judgment in favor of Wayne Scott, and remand. In all other respects, I concur.